THE DISTILLING AND CATTLE FEEDING COMPANY

*v.*

THE PEOPLE *ex rel.* M. T. Moloney, Attorney General.

*Filed at Springfield June 13, 1895.*

1. PLEADING—*in quo warranto should conform to that in civil actions.* The pleadings in *quo warranto* should conform, as far as possible, to the general principles and rules which govern in civil actions.

2. SAME—*in quo warranto—proper course of defendant.* The defendant in a *quo warranto* proceeding must either disclaim or justify.

3. SAME—*disclaimer and justification cannot be joined in one plea.* Disclaimer and justification are repugnant and inconsistent in a *quo warranto* proceeding, and a' plea attempting to join them is subject to demurrer.

4. SAME—*instance of demurrable plea in quo warranto.* A plea in *quo warranto* denying that *all* the firms, individuals and corporations alleged to have joined in a trust were engaged in operating distilleries, purchasing corn and manufacturing and selling spirits, and that they *all* transferred their capital stock to the trust, is subject to demurrer as double, evasive and argumentative, and as containing negatives pregnant.

5. APPEALS AND ERRORS—*quo warranto—review of information on appeal.* The sufficiency of an information in *quo warranto*, in point of substance, to sustain a judgment, is reviewable on error, whether previously challenged by demurrer or not.

6. MONOPOLIES—*contract to prevent competition void.* A combination to control the manufacture and sale of all distillery products, so as to stifle competition and dictate amounts manufactured and selling prices, is an illegal attempt to create a monopoly.

7. SAME—*incorporating such combination does not legalize it.* The incorporation of an organization formed to monopolize a business, and the transfer to the corporation of the property of the various members, do not purge the combination of its illegality.

8. CORPORATIONS—*suit against, by corporate name, admits organization.* A proceeding against a defendant corporation by its corporate name impliedly admits the regularity and legality of its corporate organization.

9. SAME—*cannot establish monopoly under a legal charter.* A charter authorizing a corporation to engage in a general distillery business in the State and elsewhere, and to own the property necessary for that purpose, gives it no power to enter upon a scheme of getting into its hands all the distillery business of the country, and establishing a virtual monopoly of the business.

APPEAL from the Circuit Court of Cook county; the Hon. JOHN GIBBONS, Judge, presiding.

This was a proceeding by *quo warranto*, brought in the name of the People of the State of Illinois, by the Attorney General, against the Distilling and Cattle Feeding Company. The defendant appeared and filed a number of pleas, to all of which demurrers were sustained, and the defendant electing to abide by its pleas, judgment was rendered against it, ousting it from its franchises and for costs. From that judgment the defendant now appeals to this court.

The information alleges that on May 10, 1887, there were existing and doing business in various parts of this State five different corporations organized under our laws; also one corporation organized under the laws of the State of Missouri, and one corporation organized under the laws of the State of Ohio, and a co-partnership and an individual also doing business in that State, all of which were then engaged in operating distilleries, in the purchase of grain and in the manufacture and sale of alcohol and other distillery products, and that for the purpose of forming and creating a trust, and with the design of controlling and regulating the output, manufacture and sale of distillery products and of establishing a monopoly in the manufacture and sale of the same, the owners of the capital stock of those corporations, together with the firm and individual above mentioned, entered into and executed a trust agreement, as follows:

"WHEREAS, it is designed to form a trust, to be known as the Distillers' and Cattle Feeders' Trust, for the purpose of securing intelligent co-operation in the business of distilling spirits from grain or other material, malting and the feeding of live stock, and the sale of the products thereof in home and foreign markets, and to do all other business incidental to those enumerated; therefore it is mutually agreed by all who may sign this agree-

ment, or become, at any time, the holders of the certificates of trust herein provided for, as follows :

"*First*—The trust herein created shall be vested in nine trustees.

"*Second*—William H. Hobart, George K. Duckworth, Lewis H. Green, Peter J. Hennessy, Alfred Davis, Joseph B. Greenhut, Warren H. Corning, Adolph Woolner and John H. Francis are hereby appointed trustees, to hold their office until the first day of May, A. D. 1888, or until their successors are elected and qualified.

"*Third*—The trustees shall prepare certificates which shall show the interest of each beneficiary in said trust, and deliver them to the persons entitled thereto. The certificates shall be divided into shares of the par value of $100 each, and shall be known as 'The Distillers' and Cattle Feeders' Trust Certificates.' The trustees shall have full power to agree upon and direct the form and contents of said certificates, and the mode in which they shall be executed, attested and transferred. The certificates shall contain an express stipulation that the holders thereof shall be bound by the terms of this agreement and by the by-laws herein provided for.

"*Fourth*—No certificates shall be issued except for stock, as hereinafter provided, and the par value of the certificates issued shall represent, as nearly as possible, the actual cash value of the stock held by the trustees in trust. The certificates shall be the best evidence of the amount of interest of the beneficiaries in the trust. No duplicate certificate shall be issued by the trustees except upon surrender of the original certificate and cancellation of the same, or upon satisfactory proof of the loss thereof, and the giving of a satisfactory bond of indemnity.

"*Fifth*—Each subscriber hereto agrees to assign and transfer, absolutely, to said trustees, the number of shares of capital stock of the particular corporation or corporations indicated in article 6 of this agreement, in consideration of which said trustees do hereby agree to execute

and deliver to each subscriber trust certificates as above specified, for the number of shares, which certificates, at the par value thereof, shall represent the cash value of the stock so delivered.   The value of the capital of any corporation whose stock shall be assigned to said trustees shall be first agreed upon between said trustees and the stockholders willing to transfer the same, and after it is agreed upon there shall be no discrimination in the purchase price as between stockholders of the same corporation transferring their shares at the same time.

"*Sixth*—This agreement shall take effect as soon as those holding a majority of stock in the following corporations formed or to be formed, to-wit, the Storrs Distilling Company, by the Mill Creek Distilling Company; the Maddux-Hobart Company, by Maddux, Hobart & Co.; the White Mills Distilling Company, by George K. Duckworth; the Great Western Distilling Company ; Monarch Distilling Company ; Woolner Brothers' Distilling Company; Peoria Distilling Company; Birmingham Distilling Company, by Chicago Distilling Company; Missouri Distilling Company, by Mound City Distilling Company, have transferred the same to said trustees.   Thereafter the said trustees and their successors shall have power to purchase other stocks of the same companies or of companies organized for conducting the same business, or any of the businesses hereinbefore specified, and may issue therefor certificates of trust equal, at par value, to the cash value of the stocks so purchased, or shall have power to lease the premises of such companies, paying therefor such rental as they may deem proper, whenever, in their judgment, it is for the best interests of the trust to lease rather than purchase.

"*Seventh*—All stocks sold and transferred to said trustees shall be held by them and their successors for the benefit of all the owners of said trust certificates.   No stocks so held by said trustees shall be sold or surrendered by said trustees, during the continuance of this

trust, without the consent of a majority, in number and value, of the holders of trust certificates : *Provided, however*, that said trustees may, from time to time, assign such shares of stock as may be necessary to qualify any person or persons chosen or desired to be chosen as directors of any companies the stocks of which are held by said trustees.

"*Eighth*—That said trustees shall have power to cause corporations to be formed for the purposes and with all or any of the powers specified in section 1 of this agreement: *Provided*, that the stock of such corporations shall be issued for cash or for property at its cash value, and shall be issued to or be purchased by said trustees in the manner provided in section 6 of this agreement.

"*Ninth*—Said trustees shall receive and safely keep all moneys received from dividends or interest upon stocks or moneys held in trust, and shall distribute the same, as well as all moneys received from sales of trust property, by declaring and paying monthly dividends upon said trust certificates as funds accumulate which are not needed for the uses and expenses of the trust. The trustees shall, however, keep separate accounts of receipts from dividends and interest, and of receipts from sales of trust property, and in declaring any dividend in which moneys derived from sales of trust property are included, shall render the holders of trust certificates a statement showing what amount of the fund distributed was derived from such sales or transfers.

"*Tenth*—The trustees shall render to the holders of trust certificates, at each annual meeting, a statement of the receipts and disbursements of the trust for the year. They shall, also, whenever demanded by a majority in value of the holders of trust certificates, furnish a true and perfect inventory and appraisement of all property held in trust, and a statement, as full as possible, of the financial affairs of the various companies whose stocks are held in trust.

"*Eleventh*—Said trustees shall exercise supervision, so far as their ownership of stocks enables them to do, over the several corporations or associations whose stock is held by said trustees.   As stockholders of said corporations they shall elect, or endeavor to elect, honest and competent men as directors and officers thereof, who shall be paid a reasonable compensation for their services. They may elect themselves as such officers and directors, and shall endeavor to secure such judicious and efficient management of such corporations as shall be most conducive to the interests of the holders of trust certificates.

"*Twelfth*—None of the powers of the trustees can be exercised except by unanimous vote of their full number, either in person or by proxy, except in the election of officers as provided in the by-laws :   *Provided,* that no proxy to represent a trustee can be given to or be voted by any person other than a trustee; and in case of a disagreement among the trustees upon any matter, a majority of such trustees may call a special meeting of the holders of certificates, as herein provided for, to whom shall be submitted the matter of disagreement, and a decision of a majority in value of the holders of trust certificates present in person or by proxy shall be final, or such matter of disagreement may be submitted at any regular meeting.   The whole or any part of the foregoing provision of this article may be modified by any by-law now or hereafter adopted by the certificate holders.   The said trustees may appoint from their own number an executive committee, and may appoint other committees composed wholly or partly of persons not of the board of trustees, and delegate to such committees such of their powers as they may deem advisable.   A majority of each committee may exercise all the powers conferred upon such committee.

"*Thirteenth*—The trustees may employ and pay all such agents and attorneys as they may find it necessary to employ in the management of said trust.

"*Fourteenth*—Each trustee shall be entitled to a salary for his services of $10 per day: *Provided, however,* that such salary may be increased by a majority of the certificate holders at any regular or special meeting. All salaries and expenses connected with and growing out of the execution of the trust shall be paid by the trustees from the trust fund.

"*Fifteenth*—The board of trustees shall have its principal office in the city of Chicago, subject to change by a vote of the trustees, at which office, or in a place of safe deposit adjacent thereto, the stocks held in trust shall be kept.

"*Sixteenth*—All powers and duties vested in the trustees herein named shall vest in and be exercised by the successors of said trustees, appointed as herein prescribed.

"*Seventeenth*—Elections for trustees to succeed those herein appointed shall be held annually. At the first annual election three trustees shall be elected to hold their office for one year, three to hold their office two years, and three to hold their office for three years. Thereafter three trustees shall be elected annually to take the places of those retiring, to hold their office for three years, except those elected to fill a vacancy arising from any cause except expiration of term, who shall be elected for the balance of the term of the trustees whose place they are elected to fill. Every trustee shall hold his office until his successor is elected and qualified.

"*Eighteenth*—No person shall be eligible to the office of trustee unless he shall, at the time of his election, be the actual owner of at least five hundred shares of trust certificates, which shall stand in his name on the books of the trust, and which certificates, or an amount of not less than five hundred shares, he shall continue to be the actual owner of during his term of service, and the ownership shown as above provided.

"*Nineteenth*—Trustees shall be elected by ballot by the owners of trust certificates or their proxies. At all meet-

ings the owners of trust certificates who shall be regis-
tered as such on the books of the trustees may vote in
person or by proxy, and shall have one vote for each and
every share of trust certificates standing in their names;
but no such owner shall be entitled to vote upon any
share which has not stood in his name thirty days prior
to the day appointed for the election.  The transfer books
shall be closed for thirty days immediately preceding the
annual election.  A majority of the shares represented
at such elections shall elect.

"*Twentieth*—The annual meeting of the owners of said
trust certificates for the election of trustees and for other
business shall be held at the office of the trustees on the
Wednesday nearest the 15th day of April of each year,
and said meetings may be adjourned from day to day
until its business is completed.  Special meetings of the
owners of trust certificates may be called by a majority
of the trustees at such times and places as they may ap-
point.  It shall also be the duty of the trustees to call a
special meeting of the holders of trust certificates when-
ever requested so to do by a petition signed by the hold-
ers of $33\frac{1}{3}$ per cent in value of such certificates.  The
business of special meetings shall be confined to the
objects specified in the notice given therefor.  Notice of
the time and place of all meetings of the owners of trust
certificates shall be given by mailing a notice to the ad-
dress of each certificate holder, so far as known, at least
ten days before such meeting.

"*Twenty-first*—At any meeting by-laws may be made,
amended and repealed by not less than two-thirds in
value of the holders of trust certificates : *Provided, how-
ever*, that said by-laws shall be in conformity with this
agreement.  By-laws may be also adopted by the trustees:
*Provided, however*, that said by-laws shall not be incon-
sistent with any by-laws which have been or may be
adopted by the holders of trust certificates, nor with this
trust agreement.

"*Twenty-second*—Whenever a vacancy occurs in the board of trustees from any cause other than the expiration of the term of office, the remaining trustees may appoint a trustee to fill the vacancy until the next annual meeting, or, at their option, may call a meeting of the owners of trust certificates for the purpose of electing a trustee to fill the vacancy or vacancies.

"*Twenty-third*—If, for any reason, at any time, a trustee or trustees shall be appointed by any court to fill a vacancy or vacancies, the trustee or trustees so appointed shall hold his or their office or offices only until his or their successor or successors shall be appointed or elected in the manner above provided for.

"*Twenty-fourth*—It shall be obligatory upon all trustees to attend each and every meeting of the board of trustees, either in person or by proxy; and in the event of any trustee absenting himself from three successive meetings, or failing to be represented by proxy at such meetings, then, in such case, the office held by such trustee shall be considered vacant, and the vacancy be filled as heretofore provided.

"*Twenty-fifth*—Whenever any change shall occur in the board of trustees, the legal title to the stock and other property held in trust shall pass to and vest in the successors of said trustees without any formal transfer thereof. But formal transfer shall be made, and it shall be the duty of the board of trustees to obtain the same, and it shall be the duty of any retiring trustee, or the executor or administrator of any deceased trustee, to make such transfer.

"*Twenty-sixth*—The trust shall continue for twenty-five years from this date, and shall thereafter continue until terminated by a vote of 66⅔ per cent in value of the holders of certificates at a meeting called for that purpose. After 66⅔ per cent in value of the holders of trust certificates shall vote to terminate the trust as aforesaid, they may at the same meeting, or at a subsequent meeting

called for that purpose, decide by a vote of 51 per cent of their number, the mode in which the affairs of the trust shall be wound up, and whether the trust shall be distributed, or whether it shall be sold and the value thereof distributed, or whether part (and if so, what part,) shall be divided and what part shall be sold, and whether such sales. shall be public or private. The trustees, who shall continue to hold their offices for that purpose, shall wind up the affairs of the trust in the mode agreed upon by the holders of trust certificates, as aforesaid."

Appended to and forming a part of the foregoing agreement was a draft or form of the trust certificate therein provided for, by the terms of which the parties therein named were entitled to the number of shares therein designated in the equity of the property held by the trustees, transferable only on the books of the trustees and on surrender of the certificate; and it was expressly provided that it was issued upon condition that the holder, or any transferee thereof, should be subject to all the provisions of the agreement creating the trust, and of the by-laws adopted in pursuance thereof, as fully as if the holder or transferee had signed the trust agreement.

The information further alleges, that within one year after May 10, 1887,—the date of the trust agreement,— there had been drawn into and absorbed by the trust and combination, upon the terms and provisions of the trust agreement, eighty-one different distillery companies, organized under the laws of the various States in which they were respectively located, and which had theretofore been organized for the purpose of carrying on and operating the distillery business, and of producing alcohol, spirits, highwines and all other distillery products from the distillation of grain, and were engaged in the sale of such products; that among the eighty-one distillery companies thus drawn into and absorbed by the combination, and which had transferred all their capital

stock to the Distillers' and Cattle Feeders' Trust, were not less than twenty-two organized under the laws of this State, in addition to those which were parties to the original trust agreement, several of those companies being located in the county of Cook; that the owners of the capital stock of each of the corporations entering into or absorbed by the trust, and the officers and directors thereof, consented and agreed to the scheme of the trust and became parties thereto, and that to carry out the scheme and combination of the trust each of the corporations conveyed its real estate to some person to hold in trust for such persons as were then the holders of its capital stock, and that such trustee executed back to the corporation a lease of the real property for the term of twenty-five years, and the stockholders of the corporation thereupon surrendered the entire capital stock of the corporation to the Distillers' and Cattle Feeders' Trust in exchange for trust certificates, and thereby the trustees of the Distillers' and Cattle Feeders' Trust became the holders of all the capital stock of all of the corporations; that thereafter, and until about February 11, 1890, the trustees of the trust held, owned and controlled the capital stock of all of said corporations, and thereby, during all that time, elected from their own number a majority of the directors of each of the corporations, and directed and controlled the business of all of them, and were enabled to, and did, exercise and control all the franchises and powers of each of said corporations.

The information further alleges, that in the month of February, 1890, a special meeting of the certificate holders of the trust was held at Peoria to consider the advisability of changing the form of organization into a corporation, and of continuing the unlawful trust under a corporate form ; that at such meeting the following preamble and resolutions were adopted :

"WHEREAS, the trustees of the Distillers' and Cattle Feeders' Trust have recommended the formation of a

corporation under the laws of the State of Illinois, to be called the 'Distilling and Cattle Feeding Company,' with a capital stock of $35,000,000; and whereas, it is deemed advisable and for the best interests of the holders of the certificates of the Distillers' and Cattle Feeders' Trust that said corporation should be formed as recommended by the trustees, and that all the property now in the hands or under control of or represented or managed by the trustees of the said Distillers' and Cattle Feeders' Trust should be transferred to said corporation when formed and organized according to law, and that the certificates now held of the said Distillers' and Cattle Feeders' Trust should be exchanged for the stock of said corporation when issued, (the said certificates being of the par value of $100 each, and the said shares of stock also of the par value of $100 each,) giving to each certificate holder for each certificate of the par value aforesaid one share of the stock of said corporation of the par value aforesaid : therefore, now be it

"*Resolved*, by the holders of certificates of the Distillers' and Cattle Feeders' Trust now here present, that the trustees of the Distillers' and Cattle Feeders' Trust be and they are hereby authorized, empowered and instructed, upon receiving from the corporation known as the Distilling and Cattle Feeding Company all the capital stock of said company, to sell, convey, assign, transfer, set over and deliver to the Distilling and Cattle Feeding Company all of the right, title and interest of the trustees, as trustees of the Distillers' and Cattle Feeders' Trust, in and to all property, real, personal and mixed, of every nature, kind and description, including moneys and bills receivable ; and that said trustees also cause such proceedings to be had by the various companies interested in the Distillers' and Cattle Feeders' Trust, by the stockholders and directors thereof, as to convey all the property of said companies to the said Distilling and Cattle Feeding Company, including therein all leaseholds, leases,

contracts, and every nature, kind and description of property, including the good will of the business of the several companies, which companies shall be received and accepted by the said Distilling and Cattle Feeding Company in full payment for the entire capital stock thereof.

"*And resolved, further*, That upon receiving the stock of said company, as aforesaid, the said trustees proceed with all reasonable dispatch to exchange it for the certificates of the Distillers' and Cattle Feeders' Trust, share for share, and that the said certificates of the said Distillers' and Cattle Feeders' Trust, when received upon said exchange, be held by the said trustees until such time as a complete exchange is effected of the stock of the said Distilling and Cattle Feeding Company for all the outstanding certificates of the trust, and when such exchange has been made and all the property has been transferred and conveyed to said corporation as contemplated herein, the said certificates of the Distillers' and Cattle Feeders' Trust shall be canceled by said trustees.

"*Resolved, further*, That the remaining portion of the capital stock of the Distilling and Cattle Feeding Company, after making exchange for the certificates aforesaid of the necessary amount, be used by the said trustees in protecting and taking care of, as they shall deem best and most advisable, the outstanding contracts and obligations of the trustees and the various companies interested in the Distillers' and Cattle Feeders' Trust; and should they deem it for the best interests of all parties, they are hereby authorized to transfer said surplus of stock to the Distilling and Cattle Feeding Company, upon condition that the latter shall assume and agree to carry out all the outstanding contracts of the trustees and of the various companies interested in the trust, and shall protect the trustees and the several companies against the same.

"*Resolved, further*, That it is distinctly understood, in the re-organization into a corporation under the laws of Illinois, such agreements shall be made by the trustees with the new corporation as shall require the latter to assume all obligations and contracts of the trustees and the various plants, and keep and carry out the same to the same extent as the trustees and various companies are obligated to do.

"*Resolved, further*, That in case any of the holders of certificates of the Distillers' and Cattle Feeders' Trust refuse or neglect to exchange certificates for shares of stock, as herein provided, said trustees, as trustees for such persons, shall hold such shares of stock and receive the dividends thereon for the use and benefit of the holders of such certificates, and said shares of stock, with the accumulated earnings thereon, shall be turned over to such certificate holders whenever ready and willing to exchange their certificates for such shares of stock; and whenever a complete exchange has been made by the trustees, and when all outstanding contracts of the trustees and of the various companies interested in the trust have been fully provided for and protected, the trustees shall then wind up the affairs of the trust, and the trust agreement shall be considered as annulled and canceled; and the trustees are hereby directed to proceed with all reasonable diligence to carry out the instructions aforesaid, and when they have so done they shall be deemed completely discharged from all further liability and duties as trustees."

It is further alleged, that in pursuance of these resolutions, for the purpose of more perfectly establishing the combination and making the monopoly thereof more complete, and of exercising more fully the power of regulating the production of alcohol, spirits and other distillery products, and of more effectually preventing competition in the distillery business, and in order to clothe the unlawful combination in a legal garb, the trus-

tees of the Distillers' and Cattle Feeders' Trust organized the defendant corporation under the general Incorporation law of April 18, 1872, and the acts amendatory thereof, and the information sets out in full the certificate of incorporation executed by the Secretary of State under the great seal of State, and also the several documents accompanying and forming a part thereof. From these documents it appears that the statement required to be made for the purpose of effecting incorporation under the statute was signed and acknowledged by three of the trustees of the Distillers' and Cattle Feeders' Trust, and that it was thereby stated that the name of the proposed corporation was the Distilling and Cattle Feeding Company; that the objects for which it was formed were "to carry on a general business of distilling, re-distilling and rectifying highwines, alcohol, spirits, gins and whiskys of every kind and description, and deal in the same in the State of Illinois and elsewhere, and owning the property necessary for that purpose; and also to engage in feeding and dealing in cattle and other live stock; also malting and dealing in malt, and doing any other business incident to the main purpose of this corporation;" that the capital stock should be $35,000,-000, the amount of each share $100, and the number of shares 350,000; that the location of the principal office of the corporation should be in Peoria, and the duration of the corporation ninety-nine years.

It also appears from the documents appended to the certificate of organization, that upon filing the statement the Secretary of State appointed the three persons who executed it, commissioners to open books of subscription to the capital stock of the proposed corporation, and that thereupon all the stock was subscribed by the nine trustees of the Distillers' and Cattle Feeders' Trust, eight of them subscribing for 43,750 shares each and the ninth for 500 shares; that at a meeting of the subscribers thereupon duly called for the purpose of electing the directors

of the corporation, the nine trustees of the trust were elected such directors for the term of one year.

The information alleges that the persons who were the trustees of the trust at the time of the organization of the corporation subscribed for all the stock in the corporation and elected themselves its directors; that at the same time they, or so many of them as were necessary to constitute a majority of the directors of each of the corporations composing the trust, were directors thereof and holders of all the stock in such corporations, and that they directed a conveyance of all the property, of every kind and description, which those corporations held, to the Distilling and Cattle Feeding Company, and that as directors of those corporations they executed, or caused to be executed, to the Distilling and Cattle Feeding Company, of which they were also directors, a conveyance or transfer of all of the property of the several constituent corporations, but that they made no transfer or assignment of the stock of those various corporations so held by them, but that they, who were at the same time the directors of those respective corporations and of the Distilling and Cattle Feeding Company, continued to hold, and still hold, the stock of those several corporations; that immediately after the organization of the Distilling and Cattle Feeding Company the holders of certificates in the Distillers' and Cattle Feeders' Trust were called together, and that their trust certificates were surrendered to the trustees of the trust, and that there were thereupon issued to the holders, in lieu thereof, shares of the capital stock of the Distilling and Cattle Feeding Company, share for share, the directors of the last named company agreeing to assume and discharge all the contracts and obligations of the Distillers' and Cattle Feeders' Trust to the former owners of the stock of each of the corporations which were members of the trust; that those several corporations still continue as corporations in form, but have not been operated by their

directors since the organization of the Distilling and Cattle Feeding Company and since the transfer of all their property to the last named company; that the franchises of those corporations, since they were drawn into the trust, as above stated, have been paralyzed and held dead and useless in the hands of the directors of the Distilling and Cattle Feeding Company, and that that company directs, controls and manages the property of those corporations as fully and completely, and with the same intention and design and for the accomplishment of the same purposes, as the property and business of those respective corporations were managed, operated and controlled under the trust agreement above set forth, and that the Distilling and Cattle Feeding Company is in fact a direct continuation of the Distillers' and Cattle Feeders' Trust.

The information further alleges, that the Distilling and Cattle Feeding Company has continued to procure and obtain, from time to time, by purchase or otherwise, the entire distillery property and business of still other distillery corporations organized under the laws of the various States; that in May, 1891, it acquired, by purchase or otherwise, the entire distillery property and business of H. H. Shufeldt & Co. and of the Calumet Distilling Company, both of which were corporations organized and doing business under the laws of this State, and located at Chicago; that at the time of making these purchases, and as a part consideration therefor, it exacted from the holders of the principal part of the capital stock of those corporations contracts that they would not, at any time within five years from the date of the purchases, either jointly or severally, directly or indirectly, engage in the business of distilling at any place in the United States within one thousand miles of Chicago, and would not, during that time, have, own or be interested in the capital stock of any corporation engaged in that business within said one thousand miles, except the stock of the

Distilling and Cattle Feeding Company, and that such contracts were in illegal restraint of trade.

It is further alleged, that the Distilling and Cattle Feeding Company has been so managed and operated by its said directors that it has come into the control and substantial monopoly of the business of manufacturing highwines, spirits and other distillery products from grain in the United States, and has succeeded in obtaining, by the methods above set forth, the ownership and control of every distillery property that in November, 1892, was in active operation in the United States north of the line of the Ohio river; that in November, 1892, and at the present time, it was and is in control of the business of distilling highwines, spirits and alcohol, so that it produced or controlled, and now produces or controls, ninety-five per cent of the entire production of those articles in the United States, and that in the course of its business in the year 1892 it disposed of those products to an amount in excess of 45,000,000 gallons; that it has been the policy of the company, carried out by its officers and directors, since its organization, for the purpose of preventing competition and regulating and controlling the production and output of highwines, spirits and alcohol, to dismantle and keep idle a large number of distillery plants which it has purchased or of which it came into control and possession as aforesaid, that being only a continuation of the policy for which the Distillers' and Cattle Feeders' Trust was created and upon which it operated; that it has obtained, by purchase and exchange for its stock, the distillery plants, property and rights of the various corporations above mentioned, not for the purpose of using them in the distillery business, but to dismantle them and prevent their being used; that it has introduced a system of disposing of its output, by which, through various distributers in different parts of the United States, its productions are sold, and with each sale there is presented to the purchaser a rebate voucher,

promising to pay to the purchaser the sum of seven cents per gallon on the quantity purchased, at the end of six months, upon the condition that the purchaser shall, from the date thereof to the time of its payment, have bought all of his supply of such products as are produced by the company, and all compounds thereof, exclusively of one or more of the dealers whose names are printed on the back of such voucher, and who are the authorized distributers of the output of the products of the company; that by means of this rebate system the company brings under its control every dealer who becomes its patron, so that he is thereafter forced to continue to it his exclusive patronage or subject himself to a greater or less loss of money which he would otherwise obtain from his rebate voucher, and thus the company has not only obtained the absolute control of the different corporations · owning distilleries, and of the output of the manufacture of highwines, spirits and alcohol, but the business has been so operated as to subject all the patrons thereof to such conditions that the company has grasped, and continues to grasp, nearly the entire distillery product trade, and has been enabled to dictate, and does dictate, prices to all consumers at pleasure.

The information further alleges, that the defendant company, by means of the combination and methods aforesaid, has exercised, and now exercises, such power and control over the output of distillery products, and over consumers of the same, as to destroy all competition in the manufacture, furnishing and sale of such distillery products in this State and throughout the United States; that for twelve months past it has misused and perverted the powers and privileges conferred on it by law, and still continues to misuse and pervert such powers and privileges, and has usurped and willfully and unlawfully exercised, and continues to usurp and willfully and unlawfully exercise, powers, liberties and franchises not conferred on it by law, to-wit, the power, liberty and fran-

chise of obtaining by purchase and in exchange for its stock, and holding and owning, the whole of the property and rights of the Birmingham Distilling Company and five other distilling corporations particularly named, and causing the non-use of their powers and franchises in such manner as to put those corporations, and the property and rights thereof, under one management and control, and to destroy all diversity of interests and competition among them and the distilleries, property and plants which were held and owned by them in the manufacture and sale of highwines, alcohol and spirits and all other distillery products, and hath, by means of its unlawful control and possession of the property and rights of those corporations, and by virtue of its also having the control and management of the property and rights of the other corporations above mentioned, situate in this and other States, unlawfully prevented and destroyed all competition among them, and holds and exercises the power of maintaining a monopoly in the production of highwines, alcohol, spirits and other products, to the injury of the inhabitants and public of the county of Cook and the inhabitants and public of the State of Illinois.

The information prays that the Distilling and Cattle Feeding Company may be summoned to answer the People of the State of Illinois by what warrant it has so misused and perverted its powers and franchises, and has assumed, and now assumes, to exercise the aforesaid powers, liberties, privileges and franchises.

The defendant's pleas, being held insufficient on demurrer, were amended, and demurrers being again sustained to them, they were amended a second time. To the pleas thus amended the Attorney General interposed a special demurrer, which being sustained to all the pleas the defendant elected to abide by its pleas, and the questions presented by the record arise upon the information and the pleas as thus amended. The pleas are five in

number, and, with the exception of the fifth, are quite voluminous. .

The first plea admits that on May 10, 1887, there were existing and doing business in this State, in Ohio and in Missouri, the seven corporations, the co-partnership and the individual alleged in the information, and that on that day they entered into the trust agreement above set forth; that within one year from May 10, 1887, the trust agreement embraced about eighty-one different distillery companies, persons and firms that had, at some time prior thereto, been engaged in the distillery business; that among them were the several Illinois corporations named in the information; that those corporations had all become parties to the trust agreement prior to February 11, 1890, and that each of them conveyed its real estate to some person to be held in trust for the persons who were then stockholders in the respective corporations, and that the trustee executed back to the corporation a lease of such real estate for the term of twenty-five years, and that the respective stockholders sold and surrendered their capital stock, except so much as was necessary to be retained to qualify for a minority of directors, to the trustees named in the trust agreement and their successors; that the said trustees owned and controlled the stock in these various corporations; that a special meeting of the holders of trust certificates of the Distillers' and Cattle Feeders' Trust was held in February, 1890, at Peoria, to consider the advisability of adopting a recommendation of the trustees to form a corporation with a capital stock of $35,000,000, and that at such meeting the preamble and resolutions set out in the information were unanimously adopted; that the defendant was organized as stated in the information, and that its charter is therein correctly set forth; that the first board of directors of the Distilling and Cattle Feeding Company, incorporated as alleged, were the same individuals who had been trustees, and that they so continued until the

annual election of directors; that the defendant subsequently purchased the property and business of H. H. Shufeldt & Co. and the property of the Calumet Distilling Company, as alleged; that the defendant had dismantled the plants of the Chicago Distillery Company and of some fifteen other companies, and that it had adopted the form of rebate voucher in the information set forth.

The plea then denies that all the firms and individuals mentioned as signing the trust agreement were, on May 10, 1887, engaged in operating distilleries, in the purchase of corn, and in the manufacture of spirits and in the sale of the same. It denies that the trust agreement was signed by said persons and corporations for the purpose of forming and creating a trust, with the design of controlling and regulating the output, manufacture and sale of distillery products in the county of Cook and State of Illinois, and in the United States of America. It denies that the agreement was entered into for the purpose of establishing a monopoly in the manufacture and sale of alcohol, spirits and highwines and all other distillery products. It denies that the eighty-one distilling companies mentioned in the information were, at the time they became parties to the agreement, or had been for several years prior thereto, carrying on and operating the distilling business and producing alcohol, spirits and highwines, and all other distillery products from the distillation of grain, or that they were then engaged in the sale of such products. It denies that all of said distilling companies transferred their capital stock to the Distillers' and Cattle Feeders' Trust. It denies that the real estate of the respective corporations named in the information was conveyed to any trustee for the purpose of carrying out any scheme of combination and trust, or that the stock of such corporations was sold and transferred to the trustees of the trust for the purpose of effecting or carrying out any unlawful organization. It denies that the properties formerly belonging to the several corpora-

tions were transferred to the defendant under and by virtue of, or in accordance with, the preamble and resolutions set out in the information as having been adopted by the certificate holders in February, 1890. It denies that in pursuance of such resolutions, and for the purpose of more perfectly establishing said combination and making the monopoly thereof more complete, and exercising more fully the power of regulating the production of alcohol, spirits and highwines, and of more effectually preventing competition in the distillery business, and in order to clothe the unlawful combination in legal guise, the trustees organized the defendant corporation, and it denies that the defendant was formed with any such purpose or intent as charged in the information.

The plea further denies that the trustees of the trust executed, or caused to be executed, to the defendant company transfers or conveyances of all the property, of every kind and description. It denies that the individuals who were trustees of the trust and who were directors of the defendant, or who were directors of the respective corporations above mentioned, continued to hold, or still hold, any stock in those corporations, and it denies that the individuals who were at the time to transfer, and did transfer, all the property of the respective corporations to the defendant, then were and still remain directors of those corporations, and then were and still are directors of the defendant. It denies that the holders of certificates in the trust were called together, and that their certificates were surrendered to the trustees of the trust, and that there were issued to them, in lieu thereof, shares of the capital stock of the defendant, as alleged in the information. It denies that the several corporations which went into and became members of the trust still continue as corporations, in form. It denies that the defendant controls and manages the property of those corporations, as stated in the information. It denies that the defendant manages said property, or any of it, as it was man-

aged by the respective corporations while parties to the trust.   It denies that the defendant is a direct continuation of the trust.   It denies that the defendant has been so managed and operated by its directors as to have come into the control and substantial monopoly of the business of manufacturing highwines, spirits and other distillery products from grain in the United States.   It denies that it has succeeded in obtaining, by means of the methods set out in the information, the ownership or control of every distillery property that in November, 1892, was in active operation in that portion of the United States north of the Ohio river.   It denies that in November, 1892, and at the present time, it was and is in control of the business of distilling highwines, spirits and alcohol, so as to produce or control, or to now produce or control, ninety-five per cent of the entire product of those articles in the United States.   It denies that it has been or is now its policy, for the purpose of preventing competition and controlling the production and output of highwines, spirits and alcohol, to dismantle and keep idle, or that it has dismantled and kept idle, a large number of distilling plants which it has purchased or into the possession of which it has come.   It denies that it is a part of the defendant's policy to dismantle any plants or prevent their being used, or that it has or does keep such property idle that could be used without loss in the production of alcohol, spirits and highwines.   It denies that by means of the operation of the rebate system the defendant brings under its control every dealer who becomes its patron, or that he is thereafter forced to continue his exclusive patronage or subject himself to a greater or less loss of money which he would otherwise obtain.

The plea further denies that the defendant has obtained the absolute control of the output and manufacture of highwines, spirits and alcohol.   It denies that the defendant has been so operated as to subject all its

patrons to such condition that it has grasped, and continues to grasp, nearly the entire distillery product and trade. It denies that the defendant has been or is now enabled to dictate, or that it does dictate, prices to consumers at pleasure. It denies that the defendant has exercised, or now exercises, such power of control over the output of distillery products, and over consumers of the same, as to destroy all competition in the manufacture, furnishing and sale of distillery products. It denies that for twelve months last past, at the county of Cook, the defendant has misused and perverted the powers and privileges conferred on it by law. It denies that it still continues to misuse and pervert its powers and privileges, or that it has usurped and willfully exercised, or still continues to usurp and willfully exercise, powers, liberties, privileges and franchises not conferred by law. It denies that the defendant has, in any manner and form, as stated in the information, abused its powers and privileges, contrary to the statutes of the State or the common law of the land. It denies that it has destroyed all diversity of interest and of competition among the distilleries, properties and plants which are held and owned, or which were held and owned, by their former owners. It denies that the defendant has unlawfully misused and perverted its powers and franchises, and usurped to itself, and still unlawfully usurps, holds and exercises, the power of maintaining a monopoly on the production, for sale, of highwines, alcohol, spirits and other distillery products. It denies that the defendant has, in any sense, as charged in the information, attempted to monopolize, or had any purpose of monopolizing, the manufacture and sale of distillery products. It denies that the powers and franchises granted to the defendant in and by its charter have been for twelve months last past, and still are, perverted and abused by the defendant, its stockholders, directors and managers, for the purpose of establishing a monopoly in the distilling business. It denies that the

defendant has, by the means stated in the information, or in any other way, created and established, and now maintains in the county of Cook, a virtual monopoly on the business of producing for sale, and of selling, high-wines, alcohol, spirits and other distillery products, contrary to law and against the peace and dignity of the People of the State of Illinois.

The plea then alleges, on the contrary, that the defendant uses its franchises, powers and privileges in the State of Illinois under and by virtue of the charter set out in the information, which charter is made a part of the plea, and under and by virtue of no other power or authority than that conferred by said charter and the laws of the land; that after its incorporation the defendant purchased the various plants of the companies, persons and firms named in the information for a good and valuable consideration, for the purpose and with the intention of utilizing and using such plants in producing distilled spirits, highwines and alcohol, and for no other purpose whatever; that it found, on investigation, that some of the plants so purchased, on account of their location and construction, could not be operated without loss, and thereupon the defendant did dismantle some of them, and used the machinery therein in refitting and repairing the other plants purchased of the corporations and persons in the information mentioned; that said plants were not dismantled for the purpose of preventing competition, but for the purpose of using their machinery in repairing and refitting other plants better located for the business, and in which distilling could be carried on more economically and successfully; that prior to and at the time the defendant purchased the properties described in the information, the producing capacity in the territory in the information mentioned was at least four times greater than the demand in this country for distilled spirits, alcohol, highwines and other products of the still, by reason whereof a large number of the

plants, to-wit, forty-eight, had been for a long time idle, and portions of their machinery had become useless, and they were valuable only for such machinery as had not been injured by non-use and was capable of being used in refitting other distilleries, as above stated; that the defendant's sole and only purpose in purchasing said properties was to operate distilleries to meet the demand of the public and to secure only fair remuneration and returns for the investment, and not to create a monopoly, or prevent, in any manner, any other persons, parties or corporations from engaging in like business in the territory described in the information.

The plea further alleges, that in the purchase of all of these properties, except that known as the H. H. Shufeldt & Co. property and the Calumet Distillery property, the defendant placed no restrictions upon the sellers from going into the same business at any time and anywhere in the United States; that it purchased the Shufeldt property from the firm composed of Henry H. Shufeldt and John Lynch, and that in the purchase of that property and the good will of the business the sellers contracted not to engage in the same business within one thousand miles of Chicago for the limited period of five years, and a similar contract existed with the Calumet Distilling Company, and that these were the only two properties touching which any condition or restraint was imposed upon the sellers in the purchase of said several properties; that all of the properties purchased from corporations were purchased under and by direction and authority of the stockholders and directors of the several corporations; that prior to the sale of the property, to-wit, in the months of February and March, 1890, the stockholders in each of the companies adopted substantially the following resolution :

"WHEREAS, it is deemed best and for the best interests of the stockholders of this corporation to transfer all its property, of every nature, kind and description, including

all brands and good will of the business, to the Distilling and Cattle Feeding Company, a corporation organized under and by virtue of the laws of the State of Illinois; now, therefore, be it

"*Resolved*, by the stockholders of this company, that the board of directors be and they are hereby authorized to provide for the conveyance and transfer, in a proper and legal manner, of all the property of this company to the said Distilling and Cattle Feeding Company, and we, the stockholders, hereby fully authorize and empower said board of directors, in any manner they may deem advisable, to make said sale, conveyance and transfer, and we hereby ratify and confirm all their acts in that behalf, and we also hereby authorize and empower the president of the board of directors to transfer any and all leasehold interests held by this corporation in any and all real estate and contracts and agreements to the said Distilling and Cattle Feeding Company, under the seal of this corporation.

"*Resolved*, That so soon as the sale, conveyance and transfer of said property, and of said leases and leasehold interests, are made in accordance with the provisions hereof, and contracts and agreements are provided for, the board of directors shall provide for the cancellation of all outstanding stock of this corporation, as soon as the same is canceled to surrender the charter held by this company, and so notify the Secretary of State."

That the directors of each of the corporations thereafter, in pursuance of the foregoing preamble and resolutions, did, in the months of February and March, 1890, adopt substantially the following preamble and resolutions:

"WHEREAS, the stockholders of this corporation did, on the .... day of February, A. D. 1890, at the office of the corporation, at which all the stock of the corporation was represented, by resolution unanimously adopted, empower the directors to provide for the sale, conveyance

and transfer of all the property of this corporation, of every nature, kind and description, including assignment of leases and leasehold interests, to the Distilling and Cattle Feeding Company: now, therefore, be it

"*Resolved*, by the board of directors, that the president be and he is hereby authorized and empowered to make a proper bill of sale, in the name of the corporation, of all the property, of every nature, kind and description, and good will of the business, to the Distilling and Cattle Feeding Company, and also to assign, transfer and set over any and all leases held by this corporation to the said Distilling and Cattle Feeding Company, conditioned that the latter shall carry out and keep the covenants of said leases, and shall pay all rents that may become due thereon.

"*Resolved, further*, That upon so conveying and transferring said property and assigning said leases, and providing for the assuming of all outstanding contracts and agreements of this company, the president be and he is hereby authorized and empowered to cancel the outstanding stock of this corporation, in compliance with the resolution of the stockholders in that behalf; to wind up the affairs of the corporation, and to certify to the Secretary of the State of Illinois that the stock is canceled, that the said corporation has discharged all its legal liabilities, ceased to do business, and claims no further powers or privileges under or by virtue of its charter."

The plea further alleges, that the defendant acquired its property, under and by virtue of the foregoing resolutions, by proper conveyances made by the officers of the respective corporations named in the information, and not otherwise; that immediately upon the transfer of the properties being made to the defendant, the stock of the several corporations mentioned in the information was duly canceled and the business of the corporations wound up; that no stock in any of those corporations has been

in existence, or outstanding, or held by any person or parties, since May 1, 1890, and the Secretary of State of Illinois has been notified, by affidavit, that all of those corporations organized under the laws of this State have paid their debts, canceled their stock and ceased to do business, and no longer claim any rights under their respective charters, and that the Secretary of State is at liberty to use any of their names for any new corporation.

The plea further alleges, that the defendant has not, at any time since its incorporation, produced to exceed sixty-five per cent of the alcohol, spirits and highwines required by the trade or consumers; that it has not, at any time, and does not now, monopolize the trade in spirits, alcohol and highwines in the territory named, or elsewhere in the United States, but, on the contrary, shows that there are, and were at the commencement of this proceeding, in active competition with the defendant in the production of alcohol, spirits and highwines, some eighteen distillery companies, the names and places of business of which are particularly set forth in the plea, having, in the aggregate, the capacity for the daily consumption of 34,750 bushels of grain, equal to the production of at least two-thirds of the entire demand for alcohol, spirits and highwines in the country, and that those companies are in active competition with the defendant in the business, and that the defendant does not monopolize the business of producing spirits, alcohol and highwines in the territory named in the information, or elsewhere; that in addition to the above, two distillery plants are in process of erection,—one at Terre Haute, Indiana, and the other at Peoria, in this State,—with an aggregate capacity of 11,000 bushels of grain per day, both of which are designed for and intended to enter into the production of alcohol, spirits and highwines in active competition with the defendant.

The plea further alleges, that the defendant has not sought to enhance prices to dealers and consumers, and

that the average price to the dealer and consumer since the organization of the defendant has been less than the average price for the ten years preceding its organization; that the adoption of the rebate vouchers mentioned in the information is designed only to secure and retain so much of the trade as it legitimately might and could in competition with other distilleries, designing thereby only to seek a market for its goods without placing any restraint upon the sale of goods produced by other persons, parties, firms or corporations in competition with the defendant; that the defendant has a fixed price, from time to time, for its goods, based upon the cost of production, and that it has sought only, in fixing such price, to secure fair returns upon the money and labor invested in the business, and that it has not sought, at any time, to dictate or control the prices at which the goods produced by any other person, firm or corporation should be sold in the market, and that it has not sought to control the market any farther than by fair and open competition in the markets of this country and of the world.

The second plea is substantially like the first, omitting the several averments therein contained expressly denying matters alleged in the information, while the third plea merely repeats, in substance, the several denials contained in the first. The fourth plea is in substance like the first, omitting the express admissions and the express denials therein contained. The fifth plea alleges, simply, that the defendant exercises its powers, privileges and franchises of a corporation under and by virtue of the articles of incorporation set out in the information, and denies that the defendant was organized for the purpose of creating, continuing, perpetuating or being a monopoly in the manufacture and sale of distilled spirits, alcohol and highwines, or that it has done, at any time, any of the acts charged in the information with such purpose and design.

The Attorney General, in his demurrer to the foregoing pleas, alleges numerous special grounds of demurrer, and, among others, that the pleas are evasive; that they are argumentative; that they are double; that they undertake to answer the information by way of confession and avoidance, and by way of denial and traverse of the material allegations of the information, in one and the same plea, and thereby tend to great and unnecessary prolixity of pleading; that they attempt to put in issue matters of inference from the facts alleged and matters not properly issuable, and do not confess and avoid the substantial matters in the information alleged, nor disclaim or justify those matters; that the first, second and fourth pleas do not conclude to the country; that the third plea undertakes to tender divers and several distinct issues wholly immaterial and incapable of trial in this action; that it does not undertake to justify the usurpation of franchises charged in the information, nor does it disclaim the right, liberty or privilege to exercise the franchise which the information charges the defendant with exercising and usurping; that the fifth plea sets forth matters not capable of trial, and upon which apt or material issues cannot be taken.

The demurrer being sustained to all the pleas, judgment of ouster was entered against the defendant, as above stated.

STEVENS & HORTON, and RUNNELLS & BURRY, for appellant:

When a corporation is sued in *quo warranto*, no objection can be made to its organization. It can be attacked only for its doings subsequent to such organization. *Chesshire* v. *People*, 116 Ill. 493; *People* v. *Spring Valley*, 129 id. 169; High on Ex. Legal Rem. (2d ed.) sec. 661; *State* v. *Bank*, 33 Miss. 474; *People* v. *Railroad Co.* 15 Wend. 113; *State* v. *Gas Light Co.* 18 Ohio St. 262.

The issuing of the writ of *quo warranto* does not end the discretion of the court, and if the case made by the

pleadings is such that leave to file would have been refused in the first instance, the court may abate the proceedings. *People* v. *Railroad Co.* 88 Ill. 537; *People* v. *Moore,* 73 id. 133; *People* v. *Waite,* 70 id. 25; *People* v. *Boyd,* 30 Ill. App. 608; *People* v. *Hamilton,* 24 id. 609; *People* v. *Drainage Comrs.* 31 id. 219.

That a corporation may own all the property it deems necessary for its business is authorized by the statutes of this State, and is sanctioned by law. *Aurora* v. *Paddock,* 80 Ill. 265; Angell & Ames on Corp. 153; 2 Kent's Com. 280; Morawetz on Corp. secs. 164-190; *Hull* v. *Glover,* 126 Ill. 122.

The courts have always acted with caution in the forfeiture of franchises legally granted, and we call the attention of the court to a few authorities upon that point: 1 Beach on Private Corp. sec. 58; *State* v. *Bank,* 28 Pa. St. 383; *Commonwealth* v. *Bridge Co.* 20 id. 185; *People* v. *Jackson,* 9 Mich. 285; *Canal Co.* v. *Railroad Co.* 4 Gill & J. 106; 2 Waterman on Corp. 899; *Harms* v. *Railroad Co.* 51 Miss. 608; High on Ex. Legal Rem. sec. 649; *Leslie* v. *Lorillard,* 110 N. Y. 522.

The arrangement, treated as a contract, was founded upon a valid consideration, and only secured to the vendors a reasonable protection in their business. It was not an unlawful contract in restraint of trade. The authorities fully support this conclusion. *Navigation Co.* v. *Winsor,* 20 Wall. 64; *Beal* v. *Chase,* 31 Mich. 490; *Ward* v. *Byrne,* 5 M. & W. 549; *Horner* v. *Graves,* 7 Bing. 735; *Railroad Co.* v. *Car Co.* 139 U. S. 79; *Brown* v. *Rounsavel,* 78 Ill. 589; *Fowle* v. *Park,* 131 U. S. 88.

M. T. MOLONEY, Attorney General, and SAMUEL RICHOLSON, T. J. SCOFIELD and M. L. NEWELL, of counsel, for appellee:

Where there has been a willful neglect or disregard of a corporate trust, or a willful perversion thereof to private persons, so that in some manner it has worked an

injury to the public, its charter may be forfeited.   High on Ex. Legal Rem. (2d ed.) sec. 666 ; *People* v. *Bank*, 6 Cow. 217 ; *State* v. *Bank*, 5 Ark. 595.

Whatever tends to destroy competition tends to create a monopoly, and is contrary to public policy, and therefore unlawful.   *State* v. *Distilling Co.* 29 Neb. 700; *Coal Co.* v. *Barclay Coal Co.* 68 Pa. St. 173; *Craft* v. *McConoughy*, 79 Ill. 346; *Railroad Co.* v. *Collins*, 40 Ga. 582; *Transportation Co.* v. *Pipe Line Co.* 22 W. Va. 600; *Hazelhurst* v. *Railroad Co.* 43 Ga. 13.

Agreements and combinations which tend to limit, and are entered into for the purpose of limiting, the production or supply of a commodity, or of controlling the price thereof, or of preventing competition, are almost universally declared to be contrary to public policy, and therefore illegal.   *Craft* v. *McConoughy*, 79 Ill. 346; *Lumber Co.* v. *Hayes*, 76 Cal. 387.

The propositions contained in the foregoing cases are supported by the following authorities :   *State* v. *Railroad Co.* 29 Conn. 538; *Hooker* v. *Vandewater*, 4 Den. 349; *Hilton* v. *Eckersley*, 6 El. & Bl. 47; *Stanton* v. *Allen*, 5 Den. 434; *Chicago Gas Light Co.* v. *Gas Light Co.* 121 Ill. 530; *Murray* v. *Vanderbilt*, 39 Barb. 140; *Collins* v. *Locke*, L. R. 4 App. Cas. 674; *Fisher* v. *Bush*, 35 Hun, 641; *Watson* v. *Navigation Co.* 52 How. Pr. 348; *People* v. *Fisher*, 14 Wend. 9; *Gibby* v. *Gas Co.* 130 U. S. 396; *Stewart* v. *Transportation Co.* 17 Minn. 372.

Mr. JUSTICE BAILEY delivered the opinion of the court:

This proceeding being brought against the defendant by its corporate name, the regularity and legality of its organization as a corporation are impliedly admitted. (*People* v. *City of Spring Valley*, 129 Ill. 169.)   And not only is this so, but the information sets out the defendant's charter, and the proceedings which resulted in its incorporation, in express terms, thus expressly admitting the purposes of its organization and the scope of its corporate powers.   The question, then, of the defendant's organi-

zation, and of its right not only to exercise the franchise of being a corporation but to use and exercise the several powers conferred by its charter, is not raised by the information and is not in controversy here.

But the information charges the defendant with abusing its franchises, and with usurping and exercising powers, privileges and franchises which do not belong to it; and assuming, for the present, that those charges are sufficient to require an answer from the defendant, the first question presented is, whether the court below properly sustained the demurrer to the defendant's pleas.

The tendency of the courts in modern times being to regard an information in the nature of a *quo warranto* in the light of a civil remedy, invoked for the determination of civil rights, although still retaining its criminal form and some of the incidents of criminal proceedings, the better doctrine now is that the pleadings should conform, as far as possible, to the general principles and rules which govern in ordinary civil actions. (High on Ex. Legal Rem. sec. 710.) And this is especially so in this State in view of section 10 of our Practice act, which provides that in cases of this character it shall be sufficient to summon the defendant to appear and answer the plaintiff in an action of *quo warranto*, and that the issues shall be made up by answering, pleading or demurring to the petition, as in other cases. 2 Starr & Cur. Stat. 1780.

It has been repeatedly held in this State that in proceedings of this character the defendant must either disclaim or justify. If he disclaims, the People are at once entitled to judgment; and if he justifies, he must set out his title specially. *Clark* v. *People*, 15 Ill. 213; *Illinois Midland Railway Co.* v. *People*, 84 id. 426; *Holden* v. *People*, 90 id. 434; *Carrico* v. *People*, 123 id. 198. See, also, High on Ex. Legal Rem. sec. 716.

In our opinion none of the pleas in this case conform to this rule. The first plea, the substance of which is set out at length in the foregoing statement, is partly a plea

of justification and partly a disclaimer, but is neither a complete plea of justification nor a full disclaimer,—and very much the same thing may be said of all the other pleas. As was said in *Illinois Midland Railway Co.* v. *People, supra:* "Such pleas must be consistent, and not allege defenses repugnant to each other. This one contains some matters tending to show justification and others tending to show a disclaimer. In that respect the defenses set up are repugnant and inconsistent with each other, and for that reason the plea is bad."

But in addition to this, all the pleas, with perhaps the exception of the fifth, contain various defects of form, which are sufficiently pointed out by the special demurrer. The first plea,—and to a lesser extent the second, third and fourth pleas,—shows an evident attempt to follow the usual form of an answer in chancery, rather than that of a plea at law. The first plea commences with an express admission of many of the allegations of the information. Then follow a large number of express denials of particular facts alleged in the information, (those denials, so far as they go, being in the nature of disclaimers,) and the plea closes with express allegations of a large number of affirmative facts, intended, apparently, to serve by way of justification. But even if the disclaimer and the justification were both full and complete, they constitute repugnant and inconsistent defenses, and the attempt to join them in the same plea renders the plea obnoxious to demurrer.

The second plea is substantially like the first, omitting the denials. The third plea embodies simply the denials contained in the first, and the fourth contains the affirmative allegations appearing in the first.

Various of the allegations of these pleas are evasive and argumentative, and constitute negatives pregnant. It would be tedious to discuss at length the various defects of form in these pleas pointed out by special demurrer, and one or two must serve by way of example. Thus,

the denial that all the firms, individuals and corporations mentioned as signing the trust agreement, were on May 10, 1887, engaged in operating distilleries, in the purchase of corn and in the manufacture of spirits and the sale of the same, may be true, and yet all the distillery companies, firms and individuals but one may have been engaged in all those lines of business, and that one may have been engaged in part of them. Of the same character is the denial that all of the distillery companies joining the trust transferred their capital stock to the trust. This may be true, and yet all but one may have made such transfer of their stock. Various other similarly evasive averments might be cited. The pleas are double, in that they attempt to raise a great variety of issues, some material and some immaterial, thus tending to great and unnecessary prolixity of pleading. That pleas containing such defects were obnoxious to both general and special demurrers seems too clear to require extended argument.

The fifth plea differs somewhat from the others, and should be considered separately. It alleges that the defendant exercises its powers, privileges and franchises of a corporation under and by virtue of the articles of incorporation set out in the information, and denies that it was organized for the purpose of creating, continuing, perpetuating or being a monopoly in the manufacture and sale of distilled spirits, alcohol and highwines, or that it has done, at any time, any of the acts charged in the information with any such purpose or design, and denies all abuse or misuse of its powers, as charged in the information.

When this plea is analyzed it will be found that it wholly fails to tender any material issue, either by way of justification or disclaimer. It seeks to justify under its articles of incorporation, at the same time denying that it was incorporated for the purpose of creating a monopoly, or that it has done any of the acts charged

with that purpose, thus seeking to raise an issue upon the purposes or motives which actuated those who were instrumental in its organization or who have conducted its affairs, without reference to the legal character and consequences of the acts charged.   If the defendant is guilty of usurping and exercising powers and franchises not conferred upon it by law, the purpose or design with which it has done so is of little materiality.   The denial that the defendant has abused and misused its powers, as charged, is not co-extensive with the charges of the information, as the defendant is there charged, not only with abusing and misusing the powers conferred, but also with usurping and exercising powers not conferred upon it.   It thus appears that the issues tendered by the fifth plea are either evasive or immaterial, and that the demurrer to that plea also was properly sustained.

Counsel for the defendant, as we understand them, practically admit the informality and insufficiency of their pleas, but insist that the information is materially defective, and that it is insufficient, on its face, to warrant or sustain the judgment of ouster, and they claim that the demurrer ought therefore to have been carried back and sustained to the information.   It is undoubtedly the rule that in proceedings by *quo warranto*, as in other suits at law, a demurrer reaches back to the first defect in pleading, so that a demurrer to a plea may reach defects in the information.   (*People* v. *Mississippi and Atlantic Railroad Co.* 13 Ill. 66; *People* v. *Whitcomb*, 55 id. 172.)   The Attorney General, on the other hand, insists, that as no motion was made in the court below to carry the demurrer back to the information, it is too late to raise the question here.   As the case is presented in this court we do not regard it a matter of any material consequence whether the demurrer is technically carried back to the information, since the defects alleged by the defendant, if they exist, are such as may be taken advantage of on error, whether previously challenged by

demurrer or not.   They go to the sufficiency of the infor-
mation, in point of substance, to sustain the judgment,
and are available either on demurrer, on motion in arrest
of judgment or on error.   The question, then, is fairly
presented whether the information is sufficient to sustain
the judgment of ouster.

There can be no doubt, we think, that the Distillers'
and Cattle Feeders' Trust, which preceded the incorpo-
ration of the defendant, was an organization which con-
travened well-established principles of public policy, and
that it was therefore illegal.   No one who intelligently
considers the scheme of this trust, as detailed in the
information, can for a moment doubt that it was designed
to be, and was in fact, a combination in restraint of trade,
and that it was organized for the purpose of getting
control of the manufacture and sale of all distillery pro-
ducts, so as to stifle competition, and to be able to dictate
the amount to be manufactured and the prices at which
the same should be sold, and thus to create, or tend to
create, a virtual monopoly in the manufacture and sale
of products of that character.   No other business princi-
ples can be suggested upon which the development of such
an elaborate and far-reaching scheme can be accounted
for.   No rational purpose for such organization can be
shown consistent with an intention to allow business to
run in its normal channels, to give competition its legiti-
mate operation, and to allow both production and prices
to be controlled by the natural influence of supply and
demand, and the results, as shown by the information,
were such as might be anticipated.   The trust obtained
possession of nearly all the distilleries and of nearly the
entire distillery product of the United States, thus en-
abling it to dictate prices and the amount of production,
and to thus draw to itself the substantial control of the
distillery business of the country.

Combinations of this character have been frequently
made the subject of judicial investigation within the last

few years, and while the proceeding has most generally been against some one of the corporations entering into the trust, the courts, so far as they have had occasion to speak on the subject at all, have held such trusts to be illegal.    Among cases of this character reference may be had to *State* v. *Nebraska Distilling Co.* 29 Neb. 700.    The defendant in that case was one of the corporations entering into and forming the trust now under consideration, and while it was held that the action of the defendant corporation in entering into the trust was an abuse of its corporate powers, and so *ultra vires,* and the judgment of ouster was sustained on that ground, still the court, in its argument, takes the position, broadly, that the trust, having a tendency to destroy competition and to create a monopoly, was contrary to public policy and unlawful, and the inference fairly arises that if the exigencies of the case had required it the court would have unhesitatingly placed its judgment on that ground.

Another case of a similar character is *State* v. *Standard Oil Co.* 49 Ohio St. 137.    The defendant in that case was an Ohio corporation which had become a member of the Standard Oil Trust, a trust organized upon very much the same plan as the one under consideration here.    There the defendant was ousted from its power to make or perform the trust agreement, on the ground that such agreement was *ultra vires.*    But the court, in its opinion, in speaking of the Standard Oil Trust, says:  "Its object was a virtual monopoly of the business of producing petroleum, and of manufacturing, refining and dealing in it and all its products, throughout the entire country, and by which it might not merely control the production, but the price, at pleasure.    All such associations are contrary to the policy of our State, and void."

The case of *People* v. *North River Sugar Refining Co.* 54 Hun, 354, was a proceeding brought to vacate the charter of the defendant corporation for its action in becoming a member of the "Sugar Trust," an association organized

upon substantially the same plan as the trust in this case. It was held by BARRETT, J., at special term, and by DANIELS, J., at general term, that the trust was organized for an unlawful purpose, and that the action of the defendant corporation in entering into the association justified its dissolution. The judgment in this case was subsequently affirmed by the Court of Appeals, the latter court placing its decision solely on the ground of *ultra vires*, without expressing an opinion as to the legality of the trust. *People* v. *North River Sugar Refining Co.* 121 N. Y. 578.

In *Richardson* v. *Buhl*, 77 Mich. 632, a corporation known as "The Diamond Match Company" was organized under articles of incorporation which stated that its business was to manufacture, buy, sell and deal in friction matches, and all articles entering into the composition and manufacture thereof, and also in machines and machinery, whether applicable to the manufacture of friction matches or to certain other purposes, and to purchase, own and sell exclusive rights under letters patent relating to the manufacture of friction matches and to machines and machinery applicable thereto, and to other purposes, and to buy, sell, own and deal in any real or personal property necessary or convenient to the prosecution of the business. It appeared that the real object of the corporation was to buy up the property of all corporations or individuals engaged in the manufacture of friction matches, exacting from the seller, in every case, a bond that he would not, for a term of years, engage in, or aid any one else in, the manufacture of matches in any place where his action might conflict with the interest or diminish the profits of the Diamond Match Company. Suit was brought in Michigan to restrain the defendants from disposing of certain stock in the match company, held by them as security for a loan to the complainant to enable him to purchase the stock, and the circuit court granted the injunction. On appeal the purposes of the

company were declared to be unlawful, and it was held that any contract made to further them was void, as against public policy, and such as the court would neither enforce while executory nor relieve against when executed.   It was held that a corporation organized for the purpose of controlling the manufacture and sale of friction matches, and by means of which all competition was stifled and opposition crushed, and the whole business of the country in that line engrossed by the corporation, was a menace to the public, its object and direct tendency being to prevent fair competition and to control prices; that it is no answer to say that the monopoly had in fact reduced the prices of friction matches; that such policy may have been necessary to crush competition; that the fact exists that it rests in the discretion of the corporation to raise prices at any time to an exorbitant degree, and that such combinations have frequently been condemned by courts as unlawful and against public policy.

In *People* v. *Chicago Gas Trust Co.* 130 Ill. 268, the defendant corporation was organized under the general Incorporation law of this State for two purposes, as expressed in its articles of incorporation:   First, for the purpose of erecting and operating gas works for the manufacture and sale of gas in Chicago and other places in this State; and second, "to purchase and hold or sell the capital stock, or purchase or lease or operate the property, plant, good will, rights and franchises of any gas works or gas company or companies, in Chicago or elsewhere," etc. The company sought to exercise the powers claimed under the second clause only, and for that purpose bought a majority of the shares of the stock in all the gas companies in Chicago, being four in number, whereby it might have the control of all the gas companies in the city, and thus destroy competition and monopolize the gas business, and it was held that the corporation so formed was not organized for a lawful purpose, and that

all acts done by it toward the accomplishment of such object were illegal and void.

Many other decisions of similar import might be referred to, but the foregoing will suffice.   They are sufficient, in our opinion, to establish the conclusion, in which the courts of the country, with very great unanimity, seem to concur, that trusts of the character of the one described in the information as existing prior to the organization of the defendant corporation are against the policy of the law, and are therefore illegal and void.

But the defendant contends that, while this may all be so, the change in organization from an unincorporated association to a corporation, and the change in the mode of holding the distillery properties of the various corporations formerly belonging to the trust, by surrendering the stock of the corporations, by means of which the control of those properties was formerly maintained, and having the properties themselves transferred and conveyed directly to the defendant corporation, have purged the combination of its illegality.   It must be admitted that these changes, so far as they have any effect upon the rights or interests of the former stockholders in those corporations or of the public, are formal, rather than substantial.   The same interests are controlled in substantially the same way and by the same agencies as before.   The nine trustees of the trust, who, as the holders of all the capital stock of the corporations and as a majority of the directors of each, controlled such corporate property, became the subscribers for all the stock of the new corporation, and its board of directors.   The conveyance and transfer of the properties of the constituent companies to the new corporation was merely a transfer by the trustees to themselves, though in a slightly different capacity, and the former stockholders in the constituent companies simply exchanged their trust certificates, share for share, for stock in the new corporation.   That corporation thus succeeds to the trust,

and its operations are to be carried on in the same way, for the same purposes, and by the same agencies, as before.  The trust, then, being repugnant to public policy and illegal, it is impossible to see why the same is not true of the corporation which succeeds to it and takes its place.  The control exercised over the distillery business of the country—over production and prices—and the virtual monopoly formerly held by the trust, are in no degree changed or relaxed, but the methods and purposes of the trust are perpetuated and carried out with the same persistence and vigor as before the organization of the corporation.  There is no magic in a corporate organization which can purge the trust scheme of its illegality, and it remains as essentially opposed to the principles of sound public policy as when the trust was in existence.  It was illegal before and is illegal still, and for the same reasons.

But it is urged that the defendant, by its charter, is authorized to purchase and own distillery property, and that there is no limit placed upon the amount of property which it may thus acquire.  By its certificate of organization it is authorized to engage in a general distillery business in Illinois and elsewhere, and to own the property necessary for that purpose.  It should be remembered that grants of powers in corporate charters are to be construed strictly, and that what is not clearly given is, by implication, denied.  The defendant is authorized to own such property as is necessary for carrying on its distillery business, and no more.  Its power to acquire and hold property is limited to that purpose, and it has no power, by its charter, to enter upon a scheme of getting into its hands and under its control all, or substantially all, the distillery plants and the distillery business of the country, for the purpose of controlling production and prices, of crushing out competition, and of establishing a virtual monopoly in that business.  Such purposes are foreign to the powers granted by the charter.  Acqui-

sitions of property to such extent and for such purpose do not come within the authority to own the property necessary for the purpose of carrying on a general distillery business. In acquiring distillery properties in the manner and for the purposes shown by the information, the defendant has not only misused and abused the powers granted by its charter, but has usurped and exercised powers not conferred by, but which are wholly foreign to, that instrument. It has thus rendered itself liable to prosecution by the State by *quo warranto*, and we are of the opinion that, upon the facts shown by the information, the judgment of ouster is clearly warranted. It will accordingly be affirmed.

*Judgment affirmed.*