NATIONAL LEAD COMPANY (a corporation), Respondent, v. S. E. GROTE PAINT STORE COMPANY (a corporation), Appellant.

St. Louis Court of Appeals, May 2, 1899.

1. **Corporation**: TRUST AGREEMENT: SECTIONS 1 AND 2 OF SESSION ACTS OF 1891, PAGE 186, CONSTRUED. Since the act in express terms permits a violation of any of its provisions to be pleaded by a private person in a suit against him, for the price of goods purchased of a corporation, transacting business contrary to the statute, it must follow that the right to plead such a defense entitles the party so authorized by the legislature, to prove what he has pleaded.

Nat. Lead Co. v. Grote Paint Store Co.

2. ——: ——: ——: COMBINATION OF STOCKHOLDERS AND GOVERNING OFFICERS. If the stockholders and governing officers of the plaintiff corporation, combined with each other to violate any of the provisions of the section under review through the instrumentality of their corporate entity, then the corporation composed by them was a party to such illegal combination within both the letter and the spirit of the above section of the act of 1891.

3. Foreign Corporation: COMITY. To extend the principle of comity to the plaintiff corporation would not only endow it with a capacity denied a domestic corporation but would annul in its favo, the provisions of a law (act of 1891) applicable to all corporationsr foreign or domestic, and which was enacted by the state in the execution of its sovereign power of internal regulation and for the welfare of its citizens. Held, that the case should have been submitted to the jury upon the undisputed facts and documentary evidence in the record proving that the plaintiff corporation was itself a party to an illegal combination upon evidence tending to prove that it was transacting business contrary to said section of said act at the time of the purchase by defendant of the goods sued for.

*Appeal from the St. Louis City Circuit Court.*—HON. RUDOLPH HIRZEL, Judge.

REVERSED AND REMANDED.

STATEMENT OF THE CASE BY THE COURT.

On the third of February, 1894, the plaintiff, a New Jersey corporation, sued the defendant for $1,791.23, balance alleged to be due upon an itemized account for sales of white lead and oil. The petition contained a second count, praying for the same sum alleged to be due upon account stated. The defense set up by the answer is, first, that the plaintiff is the corporate successor of an illegal combination formed by the stockholders of twelve corporations to establish a trust designed to limit the price and production of goods of the kind sued for and that the incorporation of plaintiff was had to effectuate this end; second, that plaintiff is a member of an association known as the St. Louis, Paint Oil & Drug Club, which is composed of a large number of dealers in the products made

and sold by plaintiff, and that it and the other members of said club have, by contract with each other, fixed the price of said products; third, that plaintiff had an agreement with certain St. Louis dealers not to sell its products below a price fixed by it. The answer averred that the foregoing acts and doings of plaintiff were in contravention of sections 1 and 2 of the Session Acts of Missouri, 1891, page 186, which are, to wit:

"Section 1.   Any corporation organized under the laws of this or any other state or country, for transacting or conducting any kind of business in this state, or any partnership or individual or other association of persons whatsoever, who shall create, enter into, become a member of or a party to any pool, trust, agreement, combination, confederation or understanding with any other corporation, partnership, individual or any other person or association of persons, to regulate or fix the price of any article of merchandise or commodity, or shall enter into, become a member of a party to any pool, agreement, contract, combination or confederation to fix or limit the amount or quantity of any article, commodity or merchandise to be manufactured, mined, produced or sold in this state, shall be deemed and adjudged guilty of a conspiracy to defraud, and be subject to penalties as provided in this act."

"Section 2.   It shall not be lawful for any corporation to issue or to own trust certificates, or for any corporation, agent, officer or employee, or the directors or stockholders of any corporation, to enter into any combination, contract or agreement with any person or persons, corporation or corporations, or with any stockholder or director thereof, the purpose and effect of which combination, contract or agreement shall be to place the management or control of such combination or combinations, or the manufactured product thereof, in the hands of any trustee or trustees, with the intent to limit or fix the price or lessen the production and sale of any article of commerce, use or consumption, or to prevent, restrict or diminish the manufacture or output of any such article." And that by virtue of

another section of the same act defendants were absolved from any liability on the demand sued for, and where entitled to plead the act in question as a defense to the present suit. Section 5 is to wit:

"Any purchaser of any article or commodity from any individual, company or corporation transacting business contrary to any provision of the preceding sections of this act shall not be liable for the price or payment of such article or commodity, and may plead this act as a defense to any suit for such price or payment." Issue was joined by the reply. After change of venue to St. Louis county the cause was submitted to the jury under the instructions of the court, and a verdict and judgment rendered for plaintiff for the amount claimed in its petition, from which defendant appealed to the supreme court, which tribunal being without jurisdiction of the appeal, transferred the cause to this court.

The material facts shown on the trial of this case were as follows: It appeared from the itemized account attached to the petition, and hence a part of the record (R. S. 1889, sec. 2075) that the bill of goods sued for was sold to the defendant corporation in St. Louis by the branch of the plaintiff corporation operating in that city from April 3 to April 27, inclusive, in the year 1893. It also appeared from the undisputed testimony that in the year 1887, a number of stockholders in some of the largest corporations engaged in the lead business in the different states entered into an agreement to form what thereafter became the "National Lead Trust." The agreement thus made recited that its object was to secure "intelligent cooperation in dealing in lead and its products, and carrying on all other business incident thereto." The plan of the trust was to create nine trustees, who should prepare trust certificates of the par value of one hundred dollars each, which were to be given at par in exchange for "bonds and stocks" to be taken at an agreed value. The agreement also contemplated the acquisition of the stocks and bonds of the companies

in which the subscribers to the trust agreement were stockholders, "or of companies organized for conducting the same business or of any of the businesses hereinbefore specified," payment for any such properties to be made in "National Lead Trust Certificates." That bonds so acquired might be sold by the trustees, but no stock should be sold during the life of the trust without the consent of a majority, in number and value of the holders of trust certificates, but shares necessary to qualify a person for director in any of the corporations whose stock are held by the trustees might be assigned for that purpose. That such corporation should have power "to cause corporations to be formed for the purposes and with all or any of the powers specified in the trust agreement." That said trustees should pay dividends on trust certificates, render accounts upon the demand of the holders of sixty-seven per cent in value of trust certificates, furnish inventory and appraisement of property held in trust and a financial report of the "affairs of the various companies whose stocks are held in trust." Said trustees to supervise all such corporations and to elect their officers by virtue of the stock in their hands. Trust to continue twenty-one years and thereafter until sixty-seven per cent in value of the holders of its certificate should vote for its termination. In carrying out the purposes of its creation the National Lead Trust from the time of its formation until the twenty-seventh of August, 1891, issued its trust certificates to the amount of $90,000,000, and brought within its control and management a large majority of all the corporations in all parts of the country, which were engaged in the lead business, and its adjuncts. On the date mentioned the certificate holders in the trust adopted the following resolutions:

"Resolved: That the trustees of the National Lead Trust be, and they hereby are requested, authorized and empowered to take and assent to any and all such steps and proceedings at law, in equity or otherwise, for themselves as such trustees,

and as stockholders in the various corporations represented in the trust and on behalf of the holders of certificates of the National Lead Trust to so amend, alter or modify the trust agreement under which said Lead Trust was organized and exists, as shall in the discretion of the said trustees be advisable or necessary to carry out said plan of reorganization, and to accomplish the following results, viz:

"First. The sale, transfer and delivery of all or any part of the assets, properties, stock and interests now held in trust by the said trustees, or the properties represented by said stocks, or the whole or portions of both, in such manner, by such methods, at such times, for such considerations, and to such transferee or transferees as they may deem best to the end that all of the assets now held in trust, or represented by the stocks now held in trust by said trustees, shall become the property of a corporation organized or to be organized under the laws of the state of New Jersey, for which purposes and with such powers as said trustees shall approve of. Said corporation shall have a capital stock of thirty million dollars of which fifteen million dollars shall be seven per cent cumulative, preference stock, and fifteen million dollars shall be general or common stock. Said corporation shall be authorized and empowered to issue three million dollars six per cent debenture bonds, to be used for the redemption of three hundred and seventy-one thousand, three hundred and sixty-four and 25-100 dollars of mortgages upon different parts of the real estate of some of the companies, the stock of which are held by said trustees. One hundred and forty-nine thousand, four hundred and eighty-seven and thirty-six one-hundreths dollars of said bonds to be used to reimburse the trustees for cash paid for them for properties acquired since the organization of said trust, the balance of said bonds to be held in the treasury of the said New Jersey corporation, and to be disposed of to acquire additional capital for carrying on the various businesses so to be acquired by said corporation.

"Second. The exchange of the shares of the preference and of the general or common stock of the said New Jersey corporation, for the shares of the National Lead Trust, to be in the proportion of one share seven per cent preference stock and one share of the general or common stock of the New Jersey corporation for six shares of the National Lead Trust.

"Third. In case any holder of certificates of the National Lead Trust, shall fail or neglect so to exchange their certificates of the National Lead Trust, there shall be transferred to the order of the re-organization trustees named in the plans of reorganization hereinafter set forth certificates for the *pro rata* proportion of said shares of preference stock and general or common stock of the said New Jersey corporation to which said certificate holders would be entitled under said plans until such certificate holders shall surrender their National Lead Trust certificates and accept in lieu thereof their *pro rata* proportion of the shares of said preference and general or common stock of the New Jersey corporation, which shares of stock shall, in the meantime, be held subject to the order of the said re-organization trustees.

"Fourth. The formulation and carrying out of such plan or plans for accomplishing the purposes aforesaid as said reorganization trustees, or a majority of them, shall deem best.

"Fifth. The accounting and discharge of said reorganization trustees."

Thereupon the reorganization trustees procured in the state of New Jersey the incorporation of the plaintiff with a capital of $30,000,000. The objects stated in the constating articles are, to wit:

"To acquire by purchase, lease or otherwise, and to own, sell, lease, mortgage, convey, develop, improve and operate mines, to own, acquire, construct, enlarge, improve, operate and carry on work for smelting, parting, refining or working any base or precious metals, or of the products thereof, and factories for the manufacturing of lead in any and all commercial and medicinal forms and qualities, and for the manufacture

of pyroligneous acid, acetate of lye and charcoal by the process of destructive distillation, carbon dioxide, magnesia and the products thereof, together with factories or works for the purpose of producing, refining or manufacturing linseed and castor oil and vegetable, mineral or other oils and the product thereof, and compositions, articles and apparatus from and in connection therewith, and to manufacture the products of said mines and said substances; and generally to carry on such manufacturing or other business as may be necessary or convenient for the business and operations of the company, or any part thereof; to buy, sell, trade and deal in the products of said mines, factories, works and properties in their crude form, or in any state or stage of production or manufacture as well as the properties themselves, including gold and silver bullion and base and precious metals, lead and oils of every kind and quality and in any form or condition, and such other substances, products and materials as are commonly or conveniently used, manufactured, bought or sold in connection with said business or businesses, or any part or parts thereof, or as are necessary or convenient in and about or connected directly or indirectly with the transaction of the business of the said company; to purchase, acquire, hold, sell, lease, mortgage and convey any and all such real and personal property as may be necessary for the proper or convenient conduct of the business of the said company, or any part or parts thereof; to issue debenture bonds, or bonds secured by mortgage or mortgages upon the property and franchises of the said company or otherwise, and to sell the same for the purpose of raising money with which to enlarge or carry on the business of said company, or any part thereof, and for the purchase of any real or personal property thereof, or for any other lawful purpose; to purchase, acquire, hold, sell, exchange or otherwise dispose of all such stocks, bonds, securities and obligations of other companies or corporations as may be necessary or convenient for any or all the purposes of said company; and to do any and

every other act or acts, thing or things incidental to, growing out of or connected with said business or any part or parts thereof.

"The portion of the business of said company which is to be carried on without the state, the state of New Jersey, is a part of its financial business, which shall be carried on in the city of New York, a part of the purchase, manufacture and sale and delivery of its properties, goods, wares and merchandise and a part of the purchase, sale and conveyance of its real and personal property, the negotiation, sale and delivery of its stocks, debenture bonds and other securities, or such portions of said business, and such other part or parts of its business as may be or become necessary, convenient or profitable for the company to carry on out of this state.

"That the total amount of the capital stock of such company shall be thirty million dollars, divided into three hundred thousand shares of the par value of one hundred dollars each."

The expenses of organizing the plaintiff as a corporation were paid by the National Lead Trust. The entire capital of the plaintiff corporation was composed of the assets of the National Lead Trust. The transfer of properties was accomplished in this wise. The corporations whose stocks had been turned over to the National Lead Trust, as a rule, conveyed their plants and assets to the plaintiff corporation through the medium of a conveyance to the secretary of the reorganization committee, and a conveyance by him to the plaintiff corporation. The properties thus transferred were paid for by the stock of the plaintiff which was delivered to the reorganization committee, to be handed by it to the parties entitled to the certificates issued by the National Lead Trust which had been deposited with the reorganization committee. In addition to what it acquired elsewhere, the plaintiff corporation became the owner of the assets and stock of all the corporations in Missouri engaged in the lead business, either as a part of the

assets of the National Lead Trust, or by subsequent purchase. The plaintiff has made its president the president of all the Missouri corporations under its control, and while retaining the franchises of such corporations, has closed out their operations as such. The president of the plaintiff corporation made the following report of its organization to the annual meeting of the stockholders February 16th, 1893:

"To the stockholders of the National Lead Company, at the first annual meeting, February 16th, 1893, for the fiscal year ending December 31st, 1892.

"To the stockholders of the National Lead Company.

"On the 7th day of December, 1891, this company was organized for the purpose of taking over all of the assets of the National Lead Trust.

"The National Lead Trust had acquired properties, the value of which was, as originally assessed, $22,356,025, upon which they had issued certificates on the basis of four to one of real value amounting to $89,424,100. The net earnings of the trust up to the first day of January, 1892 (when the properties were assumed by the National Lead Company), after payment of the expenses of the Trustees and the reorganization expenses, and deducting the distributions that had been made to certificate holders, increased the value of the net assets to $24,938,001.53, as follows:

| | |
|---|---:|
| Plant investment | $18,081,472.77 |
| Other investments | 406,821.33 |
| Stock on hand, manufactured, in process and raw | 5,468,170.88 |
| Cash in banks | 285,920.46 |
| Notes receivable | 339,916.45 |
| Accounts receivable | 1,414,229.48 |
| | $25,996,531.37 |

Liabilities.

| | | |
|---|---:|---:|
| Accounts payable | $707,165.59 | |
| Mortgages | 351,364.25 | 1,058,529.84 |
| Net assets | | $24,938,001.53 |

"By the terms of the agreement between the shareholders of the National Lead Trust, the capital of the National Lead Company was authorized to be $30,000,000 (15,000,000 each of common and preferred), the shareholders surrendering six shares of the National Lead Trust Certificates for one each of common and preferred stock."

The report then sets forth in figures the issuance of stock under said agreement and recites that a re-valuation was made of the plant investment turned over to the plaintiff by giving it an additional fictitious value of $4,870,098.47, in order to bring about a nominal equality between the capital of plaintiff and the shares of stock issued by it. The report further sets out an itemized statement of the assets and liabilities of plaintiff, together with an account of the dividends paid on its shares of stock and the profits and losses of business for the year ending January 1, 1893, and concludes, to wit:

"It will be noted that the mortgage account which, at the inception of the business was $351,364.25, has been reduced by payments amounting during the year 1892 to $197,636, and on January 1, 1893, but $153,728.25 of this account remained unpaid.

"Authority was given by the shareholders to the directors to issue $3,000,000 of debenture bonds" for the purpose of providing for the redemption of $371,364.25 mortgages on different parts of the real estate, $149,487.36 to be used to reimburse the trustees for cash moneys paid for properties acquired since the organization of the Trust, and the balance to be held in the treasury of the New Jersey corporation, to be disposed of to acquire additional capital for carrying on the various businesses.

"So far it has not been deemed expedient or necessary to issue any portion of these bonds, the better conditions prevailing in the present form of management, rendering it unnecessary to use additional amounts of capital. It was also

concluded that it would be better to pay off the mortgages gradually.

"The company is to be congratulated on the liquidation of the very large indebtedness of the National Lead Trust during its existence. The accounts payable of this company January 1, 1893, practically represents ores, bullions and supplies of various kinds, in transit.

"The volume of business for the year exhibits a gratifying increase over the preceding years. A large amount of money was expended by the National Lead Trustees, and since by the National Lead Company, in perfecting the smelting and refining interests, practically rebuilding all its great furnaces. White lead factories disadvantageously located, or unable from any cause, to make their goods on an economic basis, have been discontinued, while others have been greatly enlarged so that the capacity for production of all classes of goods manufactured by the company has been decidedly increased. The progress of improvement in perfecting machinery to produce better goods on a cheaper basis has been continued, and is meeting with most gratifying results.

"The entire country has been redistricted and placed in charge of thoroughly competent managers, trade has been solicited and cared for by experienced salesmen, the relations between the company and its customers have been most kindly. Prices have been equitable, both to the company and its customers, and the progress in all directions has been thoroughly satisfactory.

"Having smelters in New Mexico, Colorado and Missouri, factories for manufacture in all the great cities and commercial points, forming a continuous chain through the country from St. Louis and Chicago to New York and Boston, we are advantaged by each locality and can deliver our goods at a minimum of expense for transportation and other charges.

"There has been, and always will be, competition in each class of goods manufactured by this company. It does not

aim to obtain a monopoly. By continuous efforts for improvements of quality of goods, economics in manufacture and distribution, earnest zeal in aiding our customers, uniform and fair prices, large stocks of material on hand (constantly improving with age), to meet every emergency of trade, gradual assimilation of other branches to fully round up our manufacturing interests, the better understanding by the public of the superiority of our manufacture over that possible by others by reason of association in this business of the best trained talent in friendly rivalry to secure the very best results, we believe we have passed the period of hazard, and feel assured of maintaining our strong position, and can reasonably expect increased business with commensurate profits.

"No longer menaced by hostile legislation, the attention of the officers of the company can be directed to further economics, and to the commercial expansion of the business on the lines already laid down, which can not fail, under the improved discipline and energetic direction of the managers of the different branches throughout the country to produce continuing favorable results.

"I am gratified to be able to state to the stockholders that all the old certificate holders of the National Lead Trust have converted their certificates into stock of the National Lead Company, excepting 3,720 shares, or four-tenths of one per cent.

"The large proportion of cash assets, as shown by the balance sheet, will undoubtedly give great satisfaction to the shareholders, being quite one-fourth of the entire capital stock.                                    Respectfully,
"W. P. Thompson, President."

At the time of the sale of the goods in suit the plaintiff corporation was operating only three of the plants which it had acquired in Missouri. The other plants which it had acquired in Missouri were either not operated, or dismantled. The prices of the products of the Missouri plants operated

by plaintiff were fixed by plaintiff's Board of Directors. Prior to the sale of stock and plants of the Missouri corporations, they were competitors in the market at home and abroad. This competition ceased when their plants and stocks were disposed of either to the National Lead Trust, or to the plaintiff. When the assets of the Gregg White Lead Company were purchased (a Missouri corporation), Mr. Gregg entered into a contract not to engage again in the lead business and was made an officer in one of the Missouri corporations now under control of plaintiff, and the plant of the Gregg White Lead Company, which was in course of construction, was discontinued. The record shows that the business of plaintiff was carried on for the same objects and by the same methods which characterized the operations of its predecessor the "National Lead Trust." The record also shows the following tenders of proof by defendant's counsel of plaintiff's agreements with other dealers in St. Louis, to wit: "Mr. Smith. Now we offer to prove, Your Honor, that the National Lead Company had during the period in which the goods, the purchase price of which is sued for in this case, were sold, had an agreement with all these houses, viz.: Platt-Thornburg Paint & Glass Co., Nelson Paint & Glass Co., Vane-Calvert Paint Co., Meyer Bros. Drug Co., Puehler-Phelan Paint Co., Moffitt-West Drug Co., G. H. Hopkins Drug Co., Merrell Drug Co., Collins Bros. Drug Co., Whitelaw Bros. and Chas. W. Barstow, by which it was agreed between the National Lead Company and each of these different houses that the lead manufactured by the National Lead Company and sold by it to these different houses, was to be sold by them at a price fixed by the National Lead Company."

To the introduction of which proposed testimony plaintiff objected, which objection was by the court sustained, to which action and ruling of the court in sustaining said objection and excluding said testimony defendant then and there duly excepted.

Mr. Smith: "Then we offer to prove that the National Lead Company is a member of the St. Louis Paint, Oil & Drug Club, and as such member has an agreement with the other members of the club, and had an agreement at the time the goods, the purchase price for which is sued for in this case, were sold, which agreement is that the members of the Paint, Oil & Drug Club will sell lead and linseed oil at a price fixed by the St. Louis Paint, Oil & Drug Club; and that the members of the St. Louis Paint, Oil & Drug Club are all engaged in the sale of white lead, linseed oil and turpentine." Judge Priest: "We object." Court: "I will sustain the objection;" to which ruling of the court defendant then and there duly excepted. Mr. Smith: "We also expect to prove that the J. S. Merrell Drug Company, and the Moffitt-West Drug Co., and the Puehler-Phelan Paint Co., the Meyer Bros. Drug Co., the Platt-Thornburg Paint & Glass Co., the Collins Bros. Drug Co., Hopkins-Weller Drug Co., Whitelaw Bros., the Nelson Paint Co., and all the jobbers in the city of St. Louis, engaged in selling white lead, linseed oil and turpentine are members of this Paint & Drug Club." The court sustained an objection to this offer of testimony and defendant excepted to its ruling at the time. The jury were instructed at length. So far as is necessary, these will be noticed hereafter.

BOYLE, PRIEST & LEHMAN for respondent.

The answer is insufficient to raise any issue upon which the defendant would be entitled to a verdict. Acts 1891, p. 186. It is not averred that plaintiff entered into any combination with any other person to limit the quantity or regulate the price of any commodity. It is not averred that any combination was made with respect of products to be manufactured or sold in this state. It is not averred that the goods were sold in this state. It is not averred that the goods were sold in this state while the plaintiff was transacting

business pursuant to any such unlawful combination as is defined by sections 1 and 2 of the Act. By the very terms of section 5 of the Act, such a defense must be made affirmatively. It is a penal statute, and the defense must be clearly made within the essential elements of the offense. State v. Railway, 83 Mo. 144; Coquard v. Nat'l, etc., Oil Co., 49 N. E. Rep. 563. The act of 1891 does not authorize, in making the defense which the defendant thought to make, an inquiry into the corporate organization or purposes and a resolution of it into integers of motives or assets. Nor does the common law. Ins. Co. v. Smith, 117 Mo. 261; St. George's Church v. Branch, 120 Mo. 286; U. S. Vinegar Co. v. Schlegel, 143 N. Y. 537; s. c., 38 N. E. Rep. 729. At the common law it is not a valid defense to an action for goods sold and delivered that the vendor was at the time a member of a trust, and the defendant must therefore rely entirely upon the act of 1891 and bring its defense clearly within the prohibitions of that Act. Nat'l Distilling Co. v. Cream City & C. Co., 56 N. W. Rep. (Wis.) 864; Brooks v. Martin, 2 Wall. 70.

S. T. G. SMITH and THOS. S. MENG for appellant.

The agreement known as the National Lead Trust agreement, was illegal and against public policy, at common law, because its tendency, purpose and effect was to create a monopoly and suppress competition, and thus to fix prices and regulate production. Therefore the combination of corporations and stockholders under said trust agreement was illegal. Unckles v. Thompson (1891), 6 N. Y. Law Journal 607; Unckles v. Colgate (1893), 72 Hun. (79 Sup. Ct. Reports) 119; People v. N. R. Sugar Ref. Co. (1889), 3 N. Y. Supp. 401; s. c. (1889), 54 Hun. 354; 7 N. Y. Supp. 406; State v. Standard Oil Co. (1892), 49 Ohio St. 137; State v. Nebraska Stilling Co. (1890), 29 Neb. 700; Distilling Co. v. People (1895), 156 Ill. 448; Bishop v. Am. Preservers Co.

(1895), 157 Ill. 284. Agreements, organizations and combinations of this character are declared to be illegal by the Missouri statute (sections 1, 2 and 4, *ante* pp. 31-2) which has been in force since 1889. To this extent the statute is declaratory of the common law. But it is not the particular form which the organization or combination may assume, but the fact that the purpose, tendency and effect of such organization or combination is to create a monopoly and suppress competition, which is against public policy and illegal. The Missouri statute is broad enough to cover all combinations of whatever kind or nature, which have this purpose, tendency or effect, and to this extent it is declaratory of the common law. Therefore, notwithstanding the change of the form of plaintiff combination from that of a self-styled "trust," to that of a self-styled "corporation," it is still illegal, the purpose, tendency and effect of the combination being still the same. Distilling Co. v. People, *supra;* Richardson v. Buhl (1889), 77 Mich. 632. And there being no dispute as to the material facts, the court should have so declared as a matter of law. People v. N. R. S. R. Co., 54 Hun. 375; Judd v. Harrington, 139 N. Y. 110; Spiva v. Mining Co., 88 Mo. 68. All combinations, associations, contracts or agreements in restraint of trade, or which tend to create monopoly, or to suppress competition, are against public policy and void. U. S. v. Trans. Mo. Frt. Ass'n (1897), 166 U. S. 290; Greer v. Payne (1896), 4 Kan. App. 153; U. S. v. Addyston Pipe Co. (1898), 85 Fed. Rep. 271; U. S. v. Coal Dealers Ass'n (1898), 85 Fed. Rep. 252. Plaintiff corporation is itself such a trust or combination as is prohibited by the Missouri statute. Am. Bisc. & Mfg. Co. v. Klotz, 44 Fed. Rep. 723; People v. Am. Sug. Ref. Co., 7 R. & C. L. J. 84; Cook on Stock and Stockholders, sec. 503a; Spelling on Trusts, sec. 128. Plaintiff corporation, as was clearly shown by the evidence, has created, entered into, or become a party to a pool, trust, agreement or combination, with the other corpo-

rations which have passed under its control, and with the officers, directors and stockholders thereof, to fix prices and limit production. Merz Capsule Co. v. U. S. Capsule Co., 67 Fed. Rep. 414; Natl. Harrow Co. v. Hench, 76 Fed. Rep. 667; Natl. Harrow Co. v. Quick, 67 Fed. Rep. 130; Trenton Potteries Co. v. Oliphant, 39 Atl. Rep. pp. 943, 944. A corporation has no right to enter into a partnership, or other combination, whereby the control of the corporation is placed in the hands of some other corporation or unincorporated body. Am. Preservers' Trust v. Taylor Mfg. Co. (1891), 46 Fed. Rep. 152; People v. N. R. S. R. Co. (1890), 121 N. Y. 582; Merz Capsule Co. v. U. S. Capsule Co., 67 Fed Rep. 414.

BOND, J.—Before passing on the legal effect of the evidence introduced in support of the answer, it is necessary to decide whether in this proceeding any evidence of the purposes of the incorporation of plaintiff dehors the statements contained in its constating articles was admissible. It is quite true as a general rule that questions affecting the right of a corporation to enjoy its franchise—to be a corporation, or its legal entity as such, can only be raised in a direct proceeding to annul or forfeit the grant to which the state granting the charter is a party, for the reason that as to third parties the legality of the corporation is avouched by its charter from the state which reserves to itself the power to withdraw the franchises bestowed upon evidence of fraudulent obtention or subsequent abuse. But the existence of this rule of procedure can not deprive the legislature of the power of enacting that inquiries affecting the validity of the charter of a corporation may be made in other proceedings than by an action in the name of the state, and this is just what was done when the anti-trust act pleaded in defendant's answer became the law of this state. By the language of the first section of that enactment a violation of its provisions is made

a crime, i. e., a conspiracy to defraud, and subjects the offender to certain penalties provided in the act. By the second section of that enactment certain things disjunctively stated are declared to be unlawful. By the fifth section thereof purchasers of goods from corporations transacting business contrary to any provision of either the first or second section of the act, are relieved from liability upon pleading the act as a defense to a suit for the price. Subsequent sections of the act provide that corporations offending any of its provisions may be dissolved by a *quo warranto* on behalf of the state. It is, therefore, perfectly plain that the act in question for the same mischiefs affords two remedies; first, nonpayment of the price of goods sold by the offending corporation, a forfeiture of its charter by a direct proceeding on the part of the state. As it thus appears that the act in express terms permits a violation of any of its provisions to be pleaded by a private person in a suit against him for the price of goods purchased of a corporation transacting business contrary to the statute, it must follow that the right to plead such a defense entitles the party so authorized by the legislature to prove what he has pleaded. The correctness of this view seems hardly to require the support of authorities. But the right of a private person to make a collateral

COLLATERAL
attack.

attack upon a corporation for abuse of its franchises, where express legislative authority to do so has been given, is the settled law of this state under repeated adjudications. Christian University v. Jordan, 29 Mo. 68; Railroad v. Winkler, 33 Mo. 354; Bank v. Garten, 34 Mo. 119; Cheeney v. The Inhabitants of the Town of Brookfield, 60 Mo. 53; Ins. Co. v. Smith, 117 Mo. 261. We are, therefore, wholly unable to assent to the views of the learned counsel for respondent that the trial court erred in receiving evidence tending to prove the real objects of the incorporation of plaintiff and the nature of the business conducted by it. Such evidence was competent under the express

statutory authority given to the defendant to plead illegality in the incorporation or business transacted by plaintiff as a ground of release from the indebtedness sued upon.

The crucial question in this case is whether the plaintiff corporation, either in its organization, or business operations in this state, has offended any of the provisions of its laws? That the predecessor of the plaintiff, the "National Lead Trust," was an unlawful combination, both in purpose and fact, is sufficiently established by the nature of the agreement under which it was created and the methods and practices resorted to in furtherance of that agreement. The agreement in question can only be construed as a contract to suppress competition, fix the prices of commodities and limit their production, and to restrain trade. Unless some one or all of these purposes had been entertained by the signers of the trust agreement, it would have not contained provisions looking to the acquisition by the trustees of the entire lead business of the country, nor would it have united in the accomplishment of that end, a majority of the stockholders of the largest corporations dealing in that product. That it had these objects in view and practically accomplished them, is evident from the fact that it started with a concert of eight corporations and terminated after having issued ninety million of trust certificates, and after it formed a combination of thirty corporations, constituting a large majority of the lead dealers of the country, who had united themselves together in the effort to realize dividends upon the aforesaid capitalization out of assets of less than one-fourth in value of the amount for which trust certificates had been issued. While the conclusion of the illegal purpose of the trust agreement is irresistible upon a consideration of its several provisions and the manner in which they were carried out, it will appear from an examination of the cases, that this result has been declared by every court called upon to review that agreement, or others substantially like it. State

ex rel. v. Standard Oil Co., 49 Ohio St. 137; Distillers, etc. Co. v. The People, 156 Ill. 448; Bishop v. A. Preserving Co., 157 Ill. loc. cit. 311; People v. N. R. S. R. Co., 121 N. Y. 582; Uncles v. Colgate, 148 N. Y. 529; U. S. v. Freight Ass'n, 166 U. S. 290; U. S. v. Joint Traffic Ass'n, 171 U. S. 505. But the illegality of the organization and operation of the National Lead Trust does not involve the conclusion that the purchaser of its assets, whether a natural or artificial person, succeeded also to the status of that illegal combination under the laws enacted in this state for the punishment of pools, trusts and conspiracies. For the mere purchase by one of the assets which another has employed for an illegal purpose, does not of itself imply that they will be used by the purchaser for the purpose of effectuating the objects to which they had been devoted by the seller. Such an intent on the part of the purchaser, if inferable, must be gathered from proof of all the circumstances characterizing the transaction, as well as his subsequent conduct. As to these sources of proof, the record in the case under review shows that the beneficial owners of the property were the subscribers to the National Lead Trust and holders of its certificates, and that these same persons remained the beneficial owners of the same property after it was converted into the capital of the plaintiff corporation, the only difference being that each holder of a trust certificate received in lieu thereof shares of stock in the new corporation at an agreed rate of exchange, and the further fact that the legal title to the property was put into a corporate entity of a body of nine trustees appointed under the trust agreement. The sale itself was titular, rather than real. The corporation was professedly created to acquire the assets of the preceding trust. It was formed by the express authorization of the members of the trust and required to have "such purposes" and "such powers" as should be approved by the agents of the trust. In all other respects the fullest details of the organization of the future corpora-

tion were exactly defined and strictly prescribed in the formal resolution, adopted by the members of the National Lead Trust, directing certain agents (reorganizing trustees) to secure the specified charter of incorporation. By the terms of this resolution the projected corporation was not permitted to be formed independently of the capital furnished by the lead trust, nor was it permitted to be endowed with any "purposes" or "powers" which were not approved by the reorganizing trustees directed to obtain its charters. Moreover in point of fact it was actually created and organized in the strictest conformity with the requirements of said resolution and under a charter empowering it to carry on the business of manufacturing lead and its kindred products without restriction, and which expressly authorized it "to purchase * * * all such stocks, bonds, securities and obligations of other companies or corporations," as might be convenient in the prosecution of its business. By the obtention of the latter and other grants of power (in its charter) the plaintiff corporation secured for itself every faculty possessed by its predecessor (the National Lead Trust), for engrossing the entire business of the country in the commodities in which it was authorized to deal. For it can not be maintained that the trust had any power to acquire the stocks and bonds of other corporations engaged in the same business—and thus stifle competition—which was not expressly granted to the plaintiff in the amplest measure by the above quoted clause in its charter empowering it, in effect, to do the same thing. If, therefore, the preceding trust was an unlawful combination under the laws of this state as declared in the Acts of 1891 (then in force), it must follow that the plaintiff corporation is equally amenable to said acts, if, as the record shows the fact to be, it actually engaged through the same methods and for identical objects in a similar business to that of the former trust, unless there is something in the mere fact of the plaintiff's corporate character which exempts it from the application of the law

prohibiting combinations to fix the price or quantity of products, or to restrain trade. The learned counsel for respondent seems to claim such an exemption for the plaintiff. In discussing the question thus presented we will concede for argument only that a private business or manufacturing corporation, which has·no implied power as such to purchase shares of stock in rival corporations, may acquire such a right under the laws of New Jersey if provided for in the articles of incorporation. The first section of the Act of 1891, *supra,* provides, that any corporation wherever created which is "organized to do business in this state, or any * * * individual or other association of persons whatsoever who shall create, enter into, become a member of or a party to any pool, trust agreement, combination, confederation or understanding with any other corporation, * * * individual or any person or association of persons, to regulate or fix the price of any article of merchandise or commodity," or in the same manner "to fix or limit the amount or quantity of any article, commodity or merchandise to be manufactured, mined, produced or sold in this state," shall be deemed and adjudged guilty of a conspiracy to defraud, and be subjected to penalties as provided in this act." Can it be rationally held that the legislature had in view the commission of the criminal offense created in the foregoing section by a corporation as such, separate and apart from the individuals composing it? There is no legal ground upon which such a view can be entertained. A corporation can only act through its members or their agents. The corporate entity with which the law clothes it for special purposes is not self-acting, hence there was no thought of its action only, in the mind of framers of the statute. The evident purpose of the legislature was to specify certain acts, which, if done by its stockholders or governing bodies, should constitute a crime on the part of the corporation. It did not contemplate the commission of an offense by an impalpable abstraction, which could neither think nor act; but it intended

to bind this corporate entity by the imputed actions of its human agencies. In other words, the legislature referred to the corporation in its true essence as an association of persons without which, it could not exist, and through whom alone, it must perform all its functions as a corporate being. Morawitz on Corporations, section 227; Taylor on Corporations, section 51; State v. Standard Oil Company, 49 Ohio St. 137; Buffalo Oil Company v. Standard Oil Company, 106 N. Y. 669; Boogher v. Life Association of America, 75 Mo. 319. Hence it must follow that if the stockholders and governing officers of the plaintiff corporation combined with each other to violate any of the provisions of the section under review through the instrumentality of their corporate entity, then the corporation composed by them was a party to such illegal combination within both the letter and the spirit of the above section of the Act of 1891. Or concretely stated, that a combination which is illegal under the anti-trust law, can not be operated under the cloak of a corporation by its constituent members or governing bodies. This conclusion is believed to be irresistible in reason and has received the unwaivering support of the courts and the text writers. Ford v. Milk Shippers' Ass'n, 155 Ill. 166; People v. Gas Co., 130 Ill. 275; Distilling Co. v. People, 156 Ill. 448; Strait v. National Harrow Co., 18 N. Y. Supp. 224; Beach on Monopolies, sec. 159; Hirsch on Com. Corp., p. 86; Am. Biscuit & Mfg. Co. v. Klotz, 44 Fed. Rep. 723; National Harrow Co. v. Quick, 67 Fed. Rep. 130; Merz Capsule Co. v. U. S. Capsule Co., 67 Fed. Rep. 414. In the case of Ford v. Milk Shippers' Association, *supra,* the members of a milk trust subsequently incorporated brought action against a purchaser of the commodity sold by the corporation, who defended on the ground that it was formed in furtherance of a trust scheme and transacting business in contravention of an anti-trust act substantially the same as that pleaded in defendant's answer in the present action. It was insisted for the plaintiff that being a corpora-

tion it could not violate the statute, to which defense the supreme court of Illinois answered as follows: "The corporation, as an entity, may not be able to create a trust or combination with itself, but its individual shareholders may, in controlling it, together with it, create such trust or combination that will consitute it, with them, alike guilty." The point in judgment in that case is identical with the issue presented in the one before us. The conclusion reached by the Illinois court is logical, fully sustained by the above and other authorities, and in exact accord with the views heretofore expressed in this opinion.

Neither can the plaintiff shut off an investigation of its corporate organization and purpose upon the plea of comity due it as a foreign corporation. The doctrine COMITY. on this subject is simple and clear. It concedes no rights to a corporation of a sister state which are denied by law to a domestic corporation, or which are contrary to the laws or public policy of the state into which the foreign corporation enters for business. Toomey v. Supreme Lodge, 74 Mo. App. loc. cit. 521; affirmed in 48 S. W. Rep. 936. "This law of comity was not established for the purpose of giving any state an unlimited power to dispose of the franchise of acting in a corporate capacity in other states. To obtain a charter for the purpose of evading the laws of a foreign state, under cover of the rule of comity, would be a fraud upon the state granting the charter; and to attempt to act under such charter in the foreign state would be a fraud upon the latter. 2 Morawetz on Private Corporations, approved by the Kansas City Court of Appeals in Clayton v. Emery, 49 Mo. App. loc. cit. 351. The state of Missouri limits its busi-
LIMIT of capital- ness or trading corporations to a capitalization ization. of ten million of dollars, thus putting a practical barrier to the unwholesome effects which might accrue from corporate energy supplied with unlimited capital. By the Act of 1891, it has regulated the business of all corpo-

rations, foreign or domestic, within its borders. To extend the principle of comity to the plaintiff corporation would not only endow it with a capacity denied a domestic corporation, but would annul in its favor the provisions of a law (Act of 1891) applicable to all corporations, foreign or domestic, and which was enacted by the state in the execution of its sovereign power of internal regulation and for the welfare of its citizens. Hence it is plain that no question of comity can be invoked in this case.

Holding as we do that the corporation formed, fashioned, constituted and controlled by the parties to an illegal combination in furtherance of its purpose, afforded no barrier to an exposure by the purchaser of its goods, of the nature of its business, and the true purposes of its organization under the anti-trust act law of Missouri, the next inquiry is does the record show such a state of facts as to relieve the purchaser from liability for the goods sold to him by the plaintiff? All that the statute requires to be shown to afford such a release, in addition to the proof of the illegal character and purpose of the plaintiff corporation already referred to, is evidence that the indebtedness sued for grew out of the transaction of its business in the state. That the goods were purchased by defendant in this state hardly admits of a doubt, for the itemized account filed with plaintiff's petition shows that the sale of its commodities was made by one of its branch departments in the city of St. Louis, where the evidence also shows the defendant was engaged in business, and there was also evidence tending to prove that plaintiff was using properties it had purchased in St. Louis and East St. Louis in furtherance of its illegal design. Hence the case should have been submitted to the jury upon the undisputed facts and documentary evidence in the record proving that the plaintiff corporation was itself a party to an illegal combination on the part of its managing officers and constituent members under the first section of the Act of 1891, and upon evidence tending to prove

that it was transacting business contrary to said section of said act at the time of the purchase by defendant of the goods sued for. In the elaborate instructions given by the learned trial judge at the request of plaintiff and of his own motion, this issue was not submitted to the jury in accordance with the law as declared in this opinion, on which account the judgment in this case must be reversed and the cause remanded. As the case must be retried it is proper to pass upon the questions raised by the evidence proffered by defendant and excluded by the court, tending to show that the plaintiff as a member of a "Drug Club" was a party to an agreement to regulate or fix the price of commodities of the kind dealt in by it. The learned trial judge rejected this testimony, as shown by the memorandum on the motion for new trial, for want of specific specification in the answer of defendant of the dealers with whom the contract was alleged to have been made and the location of the club. It is questionable whether the allegations of the answer were not sufficient to entitle the defendant to the proof in question. The proof itself was clearly germane to one of the express prohibitions of the anti-trust act, and should undoubtedly have been admitted, if the issue as to such a contract to fix or regulate the price or products was sufficiently tendered by the averments of the answer. As the case must be remanded, any indefiniteness of the answer on this point may be cured by proper amendment. The result is the judgment is reversed and the cause remanded. All concur. Judge Bland in the reversal.